**JACK DANIEL DISTILLERY, Lem Motlow, Prop., Inc.,**

v.

**The UNITED STATES.**

**No. 302-63.**

United States Court of Claims.

June 9, 1967.

N. Barr Miller, Washington, D. C., for plaintiff. J. Marvin Haynes, Washington, D. C., attorney of record. Joseph H. Sheppard, Jerome D. Meeker, Robert S. Bersch, Walter D. Haynes, and Haynes & Miller, Washington, D. C., of counsel.

Theodore D. Peyser, Washington, D. C., with whom was Asst. Atty. Gen., Mitchell Rogovin, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

NICHOLS, Judge:*

This is a suit for refund of corporation income tax and assessed interest in the

---

* This case was referred to Trial Commissioner Roald Hogenson, with directions to make findings of fact and recommendation for conclusions of law. The Commissioner has done so in an opinion and report filed April 28, 1966. Exceptions were filed by the plaintiff to the commissioner's second recommended conclusion of law in regard to the defendant's counterclaim and by the defendant to the commissioner's first recommended conclusion of law. The court is in agreement with the findings of the commissioner as to both issues. We have adopted his recommended opinion except in regard to the defendant's counterclaim.

total sum of $4,274,803.73 for the fiscal years ended April 30, 1958 through 1962. While plaintiff does not claim a refund for the fiscal year ended April 30, 1957, it claims entitlement to a carryover of a net operating loss from such year to the fiscal year ended April 30, 1959. Defendant by counterclaim seeks a judgment for income tax and interest previously refunded in the sum of $559.99 for the fiscal years 1958 through 1960, and for unpaid assessments of income tax and interest in the sum of $211,838.02 for the fiscal years 1961 and 1962.

With the approval of the trial commissioner, the trial has been limited by agreement of the parties to the issues of law and fact relating to the right of each party to recover, reserving the determination of the amounts of recovery, if any, for further proceedings.

Plaintiff, a newly-formed Tennessee corporation, acquired the stock of a predecessor Tennessee corporation of the same name (hereinafter called Old Jack Daniel) on August 29, 1956, for a total purchase price of $18 million, with a down payment of $5.4 million in cash and the balance of $12.6 million in negotiable promissory notes. On September 17, 1956, plaintiff liquidated Old Jack Daniel and thereby acquired all its assets and assumed its liabilities, and thereafter carried on the whiskey distillery business previously operated by Old Jack Daniel at Lynchburg, Tennessee. Plaintiff had been incorporated by its parent, Brown-Forman Distillers Corporation, on August 25, 1956, for the specific purpose of acquiring the Old Jack Daniel stock and then liquidating Old Jack Daniel. There are two issues in this case:

1. The fair market value of the inventory of barreled whiskey, the tax-paid whiskey in bottling tanks, and the goodwill acquired by plaintiff from Old Jack Daniel for purposes of section 334 of the Internal Revenue Code of 1954; and

2. Whether the amount of $3.5 million paid to plaintiff by its parent, Brown-Forman Distillers Corporation, on August 28, 1956, was a loan or a contribution to capital.

## VALUE OF UNBOTTLED INVENTORY AND GOODWILL

The point of beginning for the valuation issue is section 334(b) (2) of the Internal Revenue Code of 1954, 26 U.S.C. § 334(b) (2) (1964). It provides that if property is received in complete liquidation of a subsidiary under section 332(b) and certain other criteria are met (all of which occurred in the instant case), the basis of the property received shall be the adjusted basis of the stock with respect to which the distribution was made. Treasury Regulations § 1.334–1(c) (4) (viii) (1954 Code), 26 C.F.R. § 1.334–1 (c) (4) (viii) (1961) provides, for the purposes of this case, that the adjusted basis of the stock shall be allocated among the tangible and intangible assets received in proportion to the net fair market value of the assets received.[1] The parties have stipulated the value of all items other than the three in dispute. The undisputed assets acquired by plaintiff in the liquidation of Old Jack Daniel including the distillery plant, buildings and equipment, land, cash, accounts receivable, raw materials and supplies, and others, and as to these defendant has accepted as fair market value the amounts shown on plaintiff's books. The valua-

[1] Net fair market value is fair market value less any specific mortgage or pledge to which it is subject. Treas.Reg. § 1.-334–1(c) (4) (viii), supra. None of the assets in question was subject to a mortgage or pledge. Therefore, fair market value and net fair market value are the same for the purposes of this case.

tions of the parties concerning the disputed items, and the cost basis of such assets on the books of Old Jack Daniel, are as follows:

|  | Defendant | Plaintiff | Cost to Old Jack Daniel |
|---|---|---|---|
| Whiskey in barrels _____ | $3,788,000 | $11,571,381.51 | $3,249,294.87 |
| Whiskey in bottling tanks _____ | 17,200 | 26,248.86 | 16,256.55 |
| Goodwill _____ | 6,706,000 | 2,507,998.30 | 0 |

The wide gap between the valuations given by the parties results in part from a use of two completely different methods of valuation and in part from a difference as to what incidents of ownership are part of fair market value.

Jack Daniel whiskey is and was what is known in the distilling industry as an irreplaceable whiskey, that is, it is a unique whiskey which has gained a reputation for its distinctive taste. Jack Daniel, being considered irreplaceable, was not sold on the bulk whiskey market. Examples of irreplaceable whiskeys were such bourbons as Old Grand-Dad, Old Forester, and Old Fitzgerald. Jack Daniel was even more distinctive than such irreplaceable bourbons, because the unique method by which it was produced gave it a taste distinct from both rye and bourbon, and it was unlike any other whiskey on the market in 1956. It was also, at that time, the highest priced domestic whiskey.

Some years prior to 1956, the distilling industry, believing that the market price for bulk whiskey did not adequately reflect the value of irreplaceable whiskeys, entered into an agreement with insurance underwriters to use a new method of valuing irreplaceable whiskey for insurance purposes. The method used was to take the case price of the whiskey in glass and subtract from this, excise taxes, bottling costs, and other charges as yet unincurred with respect to the bulk inventory. The resulting figure was considered to be the value of the matured whiskey in barrels and bottling tanks. The value of freshly distilled whiskey was established on the basis of production cost. The intermediate age whiskey was valued by prorating, according to age, the difference between the values of the mature whiskey and the fresh whiskey.

When sale negotiations began between the Old Jack Daniel stockholders and the representatives of Brown-Forman, the sellers' asking price for the Old Jack Daniel stock was placed at $20 million. This amount was arrived at by two methods. First, the anticipated combined earnings for Old Jack Daniel and its sales affiliate, Nashville Sales Company, for the fiscal year 1956 were $2 million. The Old Jack Daniel stockholders considered that a sales price of 10 times earnings, or $20 million, was reasonable. The second method was that the net tangible assets of Old Jack Daniel were valued at $15 million, and to this was added $5 million as the value of goodwill. In determining the net tangible asset value of Old Jack Daniel, the bulk inventory was valued by the same method as that used for insurance valuation.

After the initial negotiating session, Brown-Forman verified to its satisfaction the valuation given the tangible assets. In order to determine whether, for tax purposes, it could write up the unbottled inventory to the insurance value, it consulted its regular outside auditors, Lybrand, Ross Bros. & Montgomery. The auditors reviewed the projected income and cash flow, and determined that the valuation given the inventory would yield an extraordinary gross profit. They then advised Brown-Forman that they considered the proposed valuation a

correct accounting method for determining basis under § 334(b) (2) of the Internal Revenue Code of 1954.

After further negotiations, Brown-Forman and the Old Jack Daniel stockholders agreed on a purchase price of $18 million, and the sale of the Old Jack Daniel stock was consummated on August 29, 1956, with the subsequent liquidation of Old Jack Daniel on September 17, 1956.

In accordance with the market value insurance formula, plaintiff valued (as did Old Jack Daniel) the transferred inventory of barreled whiskey (3,125,277.-06 original proof gallons) at $11,571,381.-51, and the transferred inventory of whiskey in bottling tanks (1,350 regauged proof gallons) at $26,248.56, for a total valuation of $11,597,630.37, all in the manner detailed in findings 42 through 45.

In comparing its income tax liability for the fiscal period August 25, 1956 to April 30, 1957, and the fiscal years ended April 30, 1958–1962, plaintiff used as its basis for computing the cost of the unbottled inventory acquired by the liquidation of Old Jack Daniel the aforementioned valuation used for determining insurance values. These values were entered on its books on September 17, 1956. Plaintiff filed timely income tax returns for the fiscal period ended April 30, 1957, and the fiscal years 1958–62, showing taxable income or loss and tax paid, as follows:

| Taxable Year | Taxable Income (or Loss) | Tax Paid Per Return |
|---|---|---|
| 1957 | ($377,667.55) | None |
| 1958 | (1,080.17) | None |
| 1959 | 348,478.49 | $ 175,708.81 |
| 1960 | 2,318,166.67 | 1,199,946.67 |
| 1961 | 3,940,388.52 | 2,043,502.03 |
| 1962 | 5,874,356.32 | 3,049,165.29 |
| Total | $12,480,309.83 | $6,468,322.80 |

The Internal Revenue Service audited plaintiff's returns for the fiscal years 1958–62, and determined the following deficiencies:

| Taxable Year | Income Tax Deficiency |
|---|---|
| 1958 | $1,170,404.69 |
| 1959 | 1,223,537.00 |
| 1960 | 731,917.64 |
| 1961 | 324,146.59 |
| 1962 | 23,081.62 |
| | $3,473,087.54 |

The foregoing deficiencies resulted from the Commissioner's use of the Old Jack Daniel cost basis for the assets, rather than the basis recorded on plaintiff's books on September 17, 1956, in computing cost of goods sold and allowances for

depreciation of the assets acquired from Old Jack Daniel.[2] The 1959 deficiency also results in part from the disallowance of a deduction for a net operating loss carryover, based on plaintiff's original calculation that it incurred losses for fiscal 1957 and 1958, such losses giving rise to a deduction in 1959. In recomputing plaintiff's income for fiscal 1957 and 1958, the Commissioner determined that plaintiff had income for those periods.

Before this court, the defendant has retreated, to a degree, from the original position of the Commissioner that the fair market value of the bulk whiskey was the cost basis on the books of Old Jack Daniel. To the Old Jack Daniel cost basis, $3,265,551, defendant has added a "future worth factor" of $539,649, computed at 6.5 percent per year, compounded semiannually for each seasonal distillation, for a total valuation of $3,805,200.[3] The "future worth factor" was intended to take into account interest on the original investment as the whiskey matured and the storage and other charges incurred on the inventory as it matured.

The above outlined methods of valuation are the factual bases for the divergent positions of the parties. The legal definition of fair market value is the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy or sell, and both being reasonably informed as to all relevant facts. Wood v. United States, 29 F.Supp. 853, 89 Ct.Cl. 442 (1939).[4]

The principal difficulty in valuing the unbottled whiskey inventory is that because Jack Daniel is distinctive and irreplaceable, it has never been sold in bulk. Since its value has never been tested by sales in the market place, the determination of fair market value of the unbottled inventory will necessarily be constructive in nature, based upon careful consideration of the reliable and relevant testimony and evidence pertaining to what price would have been reached on September 17, 1956, between a willing seller and a willing buyer, both reasonably informed as to the facts. Old Jack Daniel proposed the insurance value as being the fair market value of the unbottled inventory, and this value was accepted by the representatives of Brown-Forman.[5] Brown-Forman's regular independent auditors determined that a purchase of the whiskey inventory at the insurance values would yield an extraordinary before-tax profit, and that the valuation was therefore a reasonable one.

In the trial of this case, R. L. Buse, Jr., president of both a whiskey brokerage company and a distillery company,

2. The defendant has accepted plaintiff's valuations of all assets other than the three in dispute. Therefore, even if the valuations in dispute are resolved in defendant's favor, plaintiff is entitled to a refund as to the assets no longer in dispute, subject to the decision on defendant's counterclaim.

3. Defendant's valuation in a larger amount than allowed by Internal Revenue as the fair market value of the unbottled inventory is another reason why plaintiff would be entitled to a refund, even if defendant's present valuation prevails.

4. See generally, 10 Mertens, Federal Income Taxation, § 59.01. (Zimet rev., 1964).

5. Defendant has attacked the negotiations between Old Jack Daniel and Brown-For-man as being either nonexistent or solely a sham for tax purposes. The trial comissioner viewed and appraised the witnesses and concluded that the negotiations took place as described in the findings. Defendant argues that because tax considerations were important to the parties and both parties had an incentive to overstate inventory value (for Old Jack Daniel stockholders, in order to secure a high sales price for the shares of stock and insure payment; for Brown-Forman, in order to get a higher basis), the valuation negotiations were necessarily solely tax-oriented. Of course, that conclusion does not necessarily follow from the above premises, and the trial commissioner has concluded that the parties to the sale concluded in good faith that the insurance value was the fair market value of the unbottled whiskey inventory.

Vernon O. Underwood, president of a large whiskey wholesaler, and G. K. McClure, treasurer of Stitzel-Weller Distillery, a whiskey distiller, all testified that, in their opinion the insurance value was the fair market value of the Jack Daniel inventory. In addition, Buse and Underwood testified that in 1956 they would willingly have purchased (if financing could have been obtained), or participated in a joint venture to purchase, the Jack Daniel inventory at the insurance value, assuming that they would have the right to sell the same under Jack Daniel labels.

The testimony is convincing that the Jack Daniel inventory could have, in 1956, been sold to a third party or parties for the insurance valuation given the inventory, if the purchaser or purchasers were given the right to sell the same under Jack Daniel labels.

Defendant makes two attacks on plaintiff's valuation which raise questions about what elements of value attach to fair market value.

As stated above, plaintiff's witnesses, in considering the fair market value of the unbottled inventory, assumed that their purchase of the inventory would have included the right to market the whiskey under the Jack Daniel labels. Defendant contends that the use of the Jack Daniel labels is an intangible and should not be included in the valuation of a tangible asset.[6]

The testimony of plaintiff's witnesses indicated that the addition of the right to use the Jack Daniel label would substantially increase the value of the unbottled inventory. For purposes of this opinion, it can be conceded that the sale of the unbottled whiskey does not automatically carry with it the right to use the Jack Daniel label. The question then arises whether the value attributable to such right has to be excluded from the fair market value.

In the ordinary commercial situation, when an item is manufactured and put into inventory, it is ready to be sold to the consuming public. If it is a unique item, the value attributable to a name or trademark will have adhered to the item at that point in time. For example, a Cadillac automobile or a Baldwin piano has a certain value when produced, and the value of the name would be virtualy inseparable from the value of the item as a whole.

Of course, the whiskey inventory had a value even without the Jack Daniel name, albeit a lower one. As to the bottled inventory, defendant accepted the value placed thereon by plaintiff. Thus, defendant (at least by implication) has conceded that the whiskey in labeled bottles had the market value which plaintiff contends should be placed on the matured whiskey (and prorata on the maturing whiskey) in barrels and in bottling tanks, less the cost of bottling and other unincurred costs. Defendant's distinction between the unbottled and bottled inventory (the latter carrying the right to use the Jack Daniel labels) is in essence the difference between finished stock and work in process.[7] This distinction is not entirely inapt, the unbottled inventory having some characteristics of work in process. The inventory had to age for a certain number of years and then be bottled and labeled before the analogy between Jack Daniel whiskey and a Cadillac would be full and complete.

On the other hand, the unbottled Jack Daniel inventory is unlike the usual work in process in many respects. The addi-

---

6. Although defendant has couched its argument in terms of use of the label, presumably the same argument would be presented if a purchaser used the Jack Daniel name without the Jack Daniel label. The inventory could have had three different values, depending upon whether the purchaser used (in descending order of value) the Jack Daniel label, the Jack Daniel name, or the term "Tennessee Whiskey." (It is assumed that a bulk purchaser could not be prevented from using the latter term.) As will be developed more fully later plaintiff has presented evidence only as to the highest possible value, and defendant has presented no evidence on any of such values.

7. See generally, Paton, Accountants' Handbook, 517 (3d ed. 1947).

tion of the word "Cadillac" to an automobile chassis or "Baldwin" to a piano leg enhances the value of the object very little, if at all. This is in complete contrast to the Jack Daniel situation. The evidence indicates that the unique qualities of Jack Daniel whiskey are generated in specialized distillation and leaching processes accomplished prior to its being placed in barrels for aging, and that the holding of the same in barrels for aging does not fit the concept of work in process in the usual sense. In addition, ordinary work in process might have little liquidation value, but only a salvage value, whereas the Jack Daniel inventory had a substantial liquidation value with or without the Jack Daniel name.

■ Taking all the above factors into consideration, it is apparent that, even though the unbottled inventory could technically be called work in process, it had already reached a stage where its distinctiveness had given its name a value inseparable in fact, if not in law, from the item itself. In the world of commercial reality, the fair market value of the inventory included the right to use the Jack Daniel label. Indeed, no businessman desiring to maximize his profit would have entertained the notion that the whiskey would be sold, unbranded, on the bulk market. The fair market value test is predicated in part on the highest and best use which can be made of the subject matter, and the evidence certainly shows that the Jack Daniel whiskey would in 1956 have sold at the highest price under its own labels. In assessing fair market value, due consideration should be given to the realities of commercial transactions, and particularly to the plain facts concerning the best use to be made of the subject matter of a sale. As a recognized commentator in the tax field has said: "Fair market value in essence means sound value; it is the price for which the owner would hold out if he could." [8] It would seem to have been sound commer-

cial practice for the Old Jack Daniel stockholders and Brown-Forman to place the value on the unbottled inventory, which they did. It must be concluded that the fair market valuation has to include, in this instance, any value attributable to the use of the Jack Daniel trade name and labels in connection with any disposition of the unbottled inventory transferred by liquidation of Old Jack Daniel.

The second problem raised by defendant is whether an asset can have a different fair market value in varying context, i. e., whether an asset has a different value as part of a sale of a going business than it would have if sold separately; and, if that question is answered affirmatively, whether the valuation of the unbottled inventory is affected by that factor in this case.

In two cited decisions, the Tax Court rejected valuations of the Commissioner which were based on the liquidation value of the asset, i. e., the amount the asset would bring if sold separately from the business. Kraft Food Co., 21 T.C. 513 (1954), rev'd on other grounds 232 F.2d 118 (2d Cir. 1956); Philadelphia Steel & Iron Corp., 23 T.C.M. 558 (1964), aff'd per curiam, 344 F.2d 964 (3d Cir. 1965). Defendant argues that these cases support the general proposition that all assets sold as part of a going business should be valued in that light. Therefore, if an asset is shown to have a lower value if sold as part of a going business, the lower value should be the fair market value for purposes of § 334(b) (2).

However, both the above cases assigned the assets in dispute a fair market value higher than the liquidating value. Plaintiff therefore claims that these cases support the general proposition advanced by it that fair market value must be determined with reference to highest and best possible use of the property.

The factual patterns in the two last-cited cases are complex and substantially different from this case, and no hard commitment can or should be made to

8. Gordon, What is Fair Market Value?, 8 Tax L.Rev. 35, 36 (1952).

either party's contention concerning any general principle to be derived from those opinions, especially when it is remembered that determination of fair market value is basically a factual decision, no matter how complicated the reasoning process involved. Even if defendant's interpretation of the two Tax Court opinions is accepted, the value of the unbottled inventory as part of a going business was at least that reasonably and in good faith given it-by the parties to the arm's-length sale of all of the Old Jack Daniel stock. Moreover, defendant's method of valuation has no relationship to either a liquidating fair market value or a going business fair market value.

The potential profit to plaintiff from purchasing the inventory at insurance value was extremely high, as was shown by the profit projections of plaintiff's auditors. The actual before-tax profit realized from the sale of the inventory was $6.2 million, more than a 50 percent return on the original investment in the whiskey inventory, and more than a 25 percent return on total costs (except taxes). Defendant has not shown why this valuation does not, in fact, represent the going business value of the unbottled inventory.[9] Defendant contend that the valuation of the individual monthly distillations was arbitrary because plaintiff showed a loss upon the disposition of a substantial portion of the unbottled inventory. While it may be true that the valuation placed on monthly distillation did not reflect fair market value, the issue is the value of the inventory as a whole, and the evidence makes it abundantly clear that the overall valuation is fair. In this context, plaintiff has provided a proper basis for valuation. See *Kraft Foods Co.*, supra, 21 T.C. at 592–593.

Defendant has raised other minor attacks on plaintiff's method of valuation. It argues that the $6.2 million profit does not justify plaintiff's valuation of the whiskey when one considers that plaintiff had to pay almost $20 million and wait 5 years to realize the gain. While acknowledging that there is a certain factor for the use of capital which is not reflected in plaintiff's profit figures, it is concluded that such factor is not nearly as great as defendant suggests. In the first place, the amount of capital tied up because of the inventory purchase was $11.9 million, not $20 million. An interest allocation based on the total purchase price of $18 million[10] would be proper only if the other assets had no independent economic value prior to the sale of the unbottled inventory. That is manifestly not the case here. Secondly, the capital was being returned to plaintiff throughout the period when the inventory was being bottled and sold, and not all in one lump sum at the end of the period, as defendant suggests. Even taking into account an interest factor for the use of capital, plaintiff still obviously made a substantial profit on its total costs for the unbottled inventory.

Defendant also points out that the profit which Old Jack Daniel would have made if it had sold the $12 million whiskey inventory separately would have been $8.5 million, which it terms "grossly excessive," being a return of approximately 243 percent on the Old Jack Daniel cost of production of $3.5 million. But, if defendant's valuation is accepted, plaintiff had a before-tax profit of 350 percent of its original investment, and approximately 55 percent of its total costs (exclusive of taxes). In addition, defendant's valuation attributes no gain to Old Jack Daniel from the sale of the inventory as part of the business.

9. This conclusion is reinforced by defendant's acceptance of plaintiff's valuation for the bottled inventory. Defendant's rationale that plaintiff's valuation is arbitrary because it includes 100 percent of the profit on the bottle-ripe whiskey applies equally to the bottled whiskey and the unbottled bottle-ripe whiskey.

10. The $20 million figure should be $18 million. The stock was purchased for $18 million, which price reflects the value of assets less liabilities. The later liquidation of Old Jack Daniel and assumption of its liabilities by plaintiff did not add anything to the purchase price.

Defendant relies upon United States v. Cornish, 348 F.2d 175 (9th Cir. 1965), but that case does not militate against the conclusion that plaintiff's valuation method was proper. The taxpayer in *Cornish* used a "work-back" formula in valuing timber and timber cutting rights. The Court of Appeals rejected the use of a "work-back" formula for two reasons. First, it took into account the prospect that the taxpayer's partnership would make a larger profit because of the unique sawmills owned by the partnership. This was a factor already taken into account in determining the fair market value of the sawmills, and if also allowed as an element of value for the timber, would result in one element of value being attributed to two assets. Second, it also took into account the prospect that the partners would exercise their unique skills in the future to continue the highly profitable nature of the business.[11]

In the instant case the skills necessary to produce the distinctive Jack Daniel whiskey had already been exercised at the time of sale; the remaining factors (aging and bottling) are a rather minor part of the overall operation, and are relatively simple and unskilled operations.

As the testimony and evidence in the present case indicate, the value of the whiskey as Jack Daniel's whiskey adhered to the inventory when it was placed in barrels to age. It had a substantial value at that time as Jack Daniel whiskey. The timber in *Cornish* had no greater value as such because certain unique skills and operations would ultimately result in an operation more profitable than other sawmills. Factually, *Cornish* is in nowise comparable with the Jack Daniel situation.

Defendant's evidence on valuation was presented by an appraiser for the Internal Revenue Service, Robert V. Brown.[12] The unbottled inventory valuation was computed by taking the cost of production, $3,265,551, and adding a "future worth factor" for each seasonal distillation of 6.5 percent, compounded semiannually, for $539,649. The total valuation was thus $3,805,200.

■ This method of valuation must be rejected, as being purely arbitrary, because it completely ignores the "market" concept in the term fair market value. Fair market value could in the abstract be higher or lower than cost, but equating cost and market price is grossly inconsistent with the seller's market for Jack Daniel whiskey existing in 1956, and with the general economic conditions prevailing at that time. Defendant here made no attempt to investigate the "market" and establish a valuation on the basis of same. Since there had been no sales of the unique Jack Daniel whiskey in bulk, the fair market value of the unbottled inventory would have to be established by the expert testimony of persons knowledgeable in market conditions relating to Jack Daniel whiskey. But because there had been no bulk sales of such whiskey, it does not follow that the "fair market value" standard can be disregarded, and an inapt standard substituted.

The testimony has overwhelmingly established that the unique method of distilling Jack Daniel produced a distinctive whiskey which was in great demand. From this it can be assumed that even as a part of the going business, the fair market value of the unbottled inventory

---

11. The Court of Appeals stated in a footnote that a similar problem arose in the valuation of the partnership inventory. It did not specifically state so, but it is clear that similar problems would only arise as to the unfinished portion of the inventory, i. e., the cut but unmilled timber, and would not be factors affecting the value of the finished lumber.

12. Plaintiff objected to Brown's testimony on the ground that he was not qual-

lified to give an expert appraisal of whiskey inventory value. Defendant's method of developing its valuation was such that it did not require longstanding and intimate knowledge of the whiskey industry. Therefore, such expertise (or lack thereof) is not the deciding factor in considering Brown's testimony. The deciding factor is the inherent validity (or lack thereof) of defendant's theory of valuation, and Brown's testimony must, of necessity, be considered in this light.

exceeded its cost. Yet defendant, in its valuation method, ascribes no profit to the inventory. The "future worth factor" is not profit, it is an allowance for additional costs incurred as the inventory matures and a percentage of interest on the capital investment in the inventory.

Defendant attempts to buttress its valuation by reference to buy-back clauses in several contracts made by distillers of irreplaceable bourbons with distributors for the sale of such whiskey in barrels. Such clauses permit the distiller to repurchase the whiskey upon the happening of certain stated events.

There are two plain reasons why defendant's valuation fails to gain weight by reliance on buy-back clauses. First, such clauses only become operable when conditions arise that force the distributor to sell the whiskey. They cannot be considered to establish an open market price, since they only operate in one direction, i. e., by placing a floor but not a ceiling on the barrel price,[13] and the contingency against which these clauses are intended to guard is a distress sale which would dump irreplaceable bourbon on the bulk market. Secondly, the barrel sales prices of irreplaceable bourbon under such contracts must have included a profit to the distiller, which, as pointed out previously, defendant has ignored in arriving at its valuation herein.

■ From all the foregoing, it is concluded that plaintiff's valuation of the unbottled inventory constitutes the fair market value as of September 17, 1956, and was properly used by it as a basis for computing its cost of goods sold and income for the years in question.

The remaining valuation problem relates to the fair market value of the goodwill transferred to plaintiff from Old Jack Daniel. During the negotiations for sale of the Old Jack Daniel stock, the goodwill was agreed to have a value of $2.5 million, and approximately this amount was entered on plaintiff's books as goodwill when Old Jack Daniel was liquidated. Plaintiff's approach to the valuation was essentially what defendant characterizes as "residual," i. e., when the fair market value of the tangibles is established, the remaining amount which the purchaser is willing to pay for the business is attributable to the goodwill.

Defendant arrived at a valuation for the intangibles by capitalizing anticipated excess earnings. Briefly stated, this was done by obtaining an average after-tax net profit (using plaintiff's earnings projections and deducting estimated average costs); applying a 6.5 percent rate to defendant's net tangible valuation to obtain a return on the tangibles; then deducting the return on the tangibles from the total projected income. The resulting sum is considered the earnings attributable to the intangibles. This amount was then multiplied by eight (standing for the estimated length of time that it would require a competitor to market Tennessee whiskey) and then reduced to its present worth by discounting it at 5 percent.

■ The residuary method, though lacking in precision for use in all cases, may in a proper case be accepted as the reasonable way to value goodwill. When it is the method actually used in good faith by the parties to the sales transaction, as in the present case, and when such parties have reasonably established the value of all other assets, there appears to be no compelling reason for rejecting it. The residuary method has been used in a substantial number of cases and appears clearly to be the proper method for this case, since the fair market value of the tangible assets and the value of the business are and were firmly established. See *Philadelphia Steel & Iron Corp.*, supra; 10 Mertens, supra, 59.37 and cases therein cited. The parties actively bargained in good faith over the value of the goodwill after they

---

13. The contract between Brown-Forman and Young's Market gave Young's Market the right to buy a certain amount of bottle-ripe Early Times under the terms of the barrel purchase contract. However, Early Times was not considered an irreplaceable whiskey.

had settled on the value of the other assets. The sellers originally wanted $5 million, the buyer originally offered $1 million, and they finally agreed upon $2.5 million.

### TREATMENT OF $3.5 MILLION PAID TO PLAINTIFF BY BROWN-FORMAN IN EXCHANGE FOR A PROMISSORY NOTE.

The defendant has counterclaimed for the tax [14] attributable to amounts accrued on plaintiff's books for the fiscal period and years involved as interest on a promissory note which was issued to Brown-Forman in return for $3.5 million of the $5.5 million in cash received from Brown-Forman when plaintiff was incorporated, $5.4 million of which was in turn paid over to Old Jack Daniel stockholders as part payment for the Old Jack Daniel stock. Defendant contends that the $3.5 million was a capital contribution rather than a loan, and that therefore plaintiff incorrectly accrued the interest deductions.

■ The question whether a receipt of funds by a subsidiary corporation from its parent is a loan [15] or a capital contribution has given rise to much litigation, resulting in apparently conflicting judicial opinion. To state the problem is simple: did the words used by the taxpayer actually and accurately describe the economic relationship of the parties, that is, did the parties intend, at the time of the issuance of the instrument, to create a real debtor-creditor relationship?; [16] to arrive at an answer is the difficult task.

■■ This area is devoid of blackletter law, as is true of any tax inquiry seeking the "substance" [17] of a given transaction. In fact, "[t]here is no one characteristic * * * which can be said

14. In oral argument Defendant's able counsel justly called this issue "peanuts" because the classification of the amounts accrued by plaintiff as interest or dividends does not result in there being a great difference in the ultimate tax liability. The reason for this is that the Internal Revenue Code (26 U.S.C. § 243) would grant a parent a deduction for 85 percent of the "dividends" it received from a domestic subsidiary, whereas if it was "interest" the subsidiary would be able to deduct the full amount (26 U.S.C. § 163) and its parent would have to include the full amount in its income (26 U.S.C. § 61). Though in this latter case the parent would lose its dividends received deduction, the two corporations would be better off as a unit. In this case the net saving would be 7.5 percent on each dollar paid by the subsidiary to its parent as interest, i. e., 50 percent of 15 percent (the increased 100 per cent deduction made available by Section 243 (b) of the Internal Revenue Code of 1954 is only available in tax years ending after 12/31/63). This counterclaim was first tendered as an issue by the Government after the "loan" had been repaid, after the commencement of this suit solely on the issue of fair market value, and after plaintiff's (and Brown-Forman's) tax returns passed audit for seven years.

15. "The classic debt is an unqualfied obligation to pay a sum certain at a rea-

sonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income." 4A Mertens, Federal Income Taxation, Section 26.10 (revised, 1966).

16. *"The essential difference between a stockholder and a creditor is that the stockholder's intention is to embark upon the corporate adventure, taking the risks of loss attendant upon it, so that he may enjoy the chances of profit.* The creditor, on the other hand, does not intend to take such risks so far as they may be avoided, but merely to lend his capital to others who do intend to take them." United States v. Title Guarantee & Trust Co., 133 F.2d 990, 993 (6th Cir. 1943). The creditor " * * * seeks a definite obligation, payable in any event." Commissioner of Internal Revenue v. Meridian & Thirteenth Realty Co., 132 F.2d 182, 186 (7th Cir., 1942).

17. The substance, not the form, of the advances will determine whether they are to be considered as loans or as capital contributions, Crown Iron Works Co. v. Commissioner of Internal Revenue, 245 F.2d 357, 359 (8th Cir., 1957); Jaeger Auto Finance Co. v. Nelson, 191 F.Supp. 693, 697 (D.C.E.D.Wis., 1961); Gilbert v. Commissioner of Internal Revenue, 262 F.2d 512, 513 (2d Cir., 1959), cert. den. 359 U.S. 1002, 79 S.Ct. 1139, 3 L.Ed.2d 1030 (1959).

to be decisive in the determination of whether the obligations are risk investments in the corporations or debts." John Kelley Co. v. Commissioner of Internal Revenue, 326 U.S. 521, 530, 66 S.Ct. 299, 304, 90 L.Ed. 278 (1946); also see Moughon v. Commissioner of Internal Revenue, 329 F.2d 399, 401 (6th Cir., 1964); Byerlyte Corp. v. Williams, 170 F.Supp. 48, 53 (D.C.N.D.Ohio, 1958), aff'd on rehearing 170 F.Supp. 60 (D.C. N.D.Ohio, 1959), reversed and remanded on other grounds 286 F.2d 285 (6th Cir., 1960) ("In the plethora of precedent on this issue there is to be found no single rule, principle or test that is controlling or decisive of the question whether advances by stockholders to a closely held or solely owned corporation are to be considered as debts or contributions to capital." at 53). Therefore, the Court must consider the specific facts of this case to determine the plaintiff-taxpayer's relationship with Brown-Forman in regard to the advance in question. The Court must examine these facts in light of the signposts that have previously been laid out,[18] always recognizing that the burden of establishing that the advance was a loan is upon the taxpaper. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440, 54 S.Ct. 788, 78 L.Ed. 1348 (1934); White v. United States, 305 U.S. 281, 292, 59 S.Ct. 179, 83 L.Ed. 172 (1938); Arlington Park Jockey Club v. Sauber, 262 F.2d 902, 905 (7th Cir., 1959).

While it may be somewhat repetitious, we will again state those introductory facts specifically bearing on the Government's counterclaim.

Early in 1956 Brown-Forman learned that Old Jack Daniel might be for sale. This prospect interested Brown-Forman as it coincided with its interest to diversify and expand its operations. Brown-Forman first offered to buy the assets of Old Jack Daniel but the latter's shareholders were only willing to consummate the purchase of Old Jack Daniel by a sale of their stock. Brown-Forman agreed to this format, setting up a subsidiary, New Jack Daniel, the plaintiff-taxpayer, to purchase the stock for $5.4 million in cash and $12.6 million in secured, negotiable, promissory notes. Old Jack Daniel was thereafter to be liquidated into New Jack Daniel.

When New Jack Daniel was incorporated, Brown-Forman decided that in addition to the Old Jack Daniel assets, New Jack Daniel would need a permanent equity capitalization of $2,000,000 in order to carry on the distillery business. This sum was paid by Brown-Forman in cash and in return it received all of New Jack Daniel's stock. At the same time Brown-Forman loaned New Jack Daniel $3,500,000 and received in return its subordinated note for the same amount.

In 1956, in order to expand and diversify its activities, Brown-Forman borrowed $19,600,000 (with $9.95 million of it being used to pay off prior long-term debt) from its usual banking sources. At that time Brown-Forman showed the $3.5 million of the new loan would provide the funds for the loan to New Jack Daniel. The additional $9.65 million loan was obviously made with this in mind.

We now turn to the specific facts and applicable standards which have led us to conclude that Brown-Forman did in fact lend $3.5 million to New Jack Daniel. Our decision, favoring New Jack Daniel, is so made because we consider the facts tending to show the note represented a true debt to outweigh those suggesting the opposite conclusion.

18. The tests the courts have used in this area have been commented upon in great detail. See Goldstein, Corporate Indebtedness to Shareholders: "Thin Capitalization" and Related Problems, 16 Tax L.Rev. 1 (1960–61); 4A Mertens, supra, n. 15, sections 26.10A–10C and cases cited therein. It is interesting to note that in Mr. Goldstein's opinion, "Section 163 [of the Internal Revenue Code of 1954] should * * * be amended to disallow the interest deduction to a corporation on any indebtedness held by a corporation which owns 80 percent of the value of its stock." Goldstein, supra, at 76. This, however, has not been done to date.

Brown-Forman and New Jack Daniel clearly intended to create a valid debtor-creditor relationship here. The note received by Brown-Forman contained an unqualified promise to repay the principal and interest on or before a fixed maturity date, regardless of New Jack Daniel's earnings. Haffenreffer Brewing Co. v. Commissioner of Internal Revenue, 116 F.2d 465, 468 (1st Cir., 1940), cert. den. 313 U.S. 567, 61 S.Ct. 942, 85 L.Ed. 1526 (1941). During the period when the $3.5 million note was outstanding, Brown-Forman represented it as a loan on its books, in its reports to the Securities and Exchange Commission and the American Stock Exchange, to its lending institutions, and to its stockholders. Interest was regularly accrued by New Jack Daniel on its books and interest receivable was regularly accrued by Brown-Forman and both companies so reflected the interest on the tax returns.

It is true, as the Government stresses, that the note in question was subordinated to the purchase money notes given to the Old Jack Daniel stockholders. However, the note was not subordinated to the claims of other creditors.[19] "Moreover, that the indebtedness was subordinated is outweighed [by the other factors herein,[20]] by the lack of other claims and the obvious benefit in facilitating any future refinancing." Brighton Recreations, Inc. v. Commissioner, 20 CCH Tax Ct. Mem. 127, 136 (1961).

This latter consideration is borne out by the fact that New Jack Daniel, soon after the loan from Brown-Forman, was able to borrow an additional $300,000 from one of the banks which participated in the loan to Brown-Forman, giving its *un*secured note in return, as to which the $3.5 million note to Brown-Forman was not subordinated. In fact, the bank President testified that if the plaintiff had requested additional credit at the time when the $300,000 loan was made it would have been granted. We must also stress the fact that Brown-Forman was not required to make any further advances to New Jack Daniel, Cf. Affiliated Research, Inc. v. United States, 351 F.2d 646, 173 Ct.Cl. 338 (1965) (where after the initial advances had been made the corporation still required further advances on several occasions) and New Jack Daniel was able to repay the loan in full in 1963. Oak Motors, Inc. v. Commissioner, 23 CCH Tax Ct. Mem. 520, 524 (1964); Cf. *Affiliated Research,* supra, (where the advances, with small exceptions, were never repaid).

Another factor that could be on the Government's side of the scales is the fact that the note was unsecured. The Government contends that this shows Brown-Forman really subjected its money to the risk that New Jack Daniel would not succeed in its venture,[21] though this risk would materialize only if the failure to succeed was such that the equity capital ($2 million) was first

---

19. "Debt is still debt despite subordination." *Kraft Foods Co.,* supra, at 232 F.2d 125–126; also see John Wanamaker Philadelphia v. Commissioner of Internal Revenue, 139 F.2d 644, 647 (3rd Cir., 1943), ("* * * the most significant charateristic of a creditor-debtor relationship [is] the right to share with general creditors in the assets in the event of dissolution or liquidation * * *."). Here we have what can be described as an involuntary subordination. The only way the purchase of Old Jack Daniel could be made was to have the New Jack Daniel stock act as security for the purchase money notes, with the note running from New Jack Daniel to Brown-Forman being subordinated to them.

20. Also see *Kraft Foods Co.,* supra, at 232 F.2d 125; Royalty Service Corp. v. United States, 178 F.Supp. 216, 220 (D. Mont.1959) (the absence of subordination is a strong factor in the taxpayer's favor); Commissioner of Internal Revenue v. O. P. P. Holding Corp., 76 F.2d 11, 12 (2d Cir. 1935) (subordination is not fatal).

21. "* * * Congress evidently meant the significant factor to be whether the funds were advanced with reasonable expectations of repayment regardless of the success of the venture or were placed at the risk of the business * * *." Gilbert v. Commissioner of Internal Revenue, 248 F.2d 399, 406 (2d Cir., 1957); Gilbert v. Commissioner of Internal Revenue, supra, n. 17.

wiped out. "To say that the advances were * * * placed at the risk of the business does not help [the Government]. All unsecured loans involve more or less risk. On all available information, the risk here was a good one." [22] The value of the aging whiskey inventory, as we have determined, was appreciating at a rate of more than $250,000 a month and New Jack Daniel had almost $3 million in working capital. Of the $5.5 million received from Brown-Forman, $5.4 million was paid to the Old Jack Daniel stockholders, leaving a balance of $100,000. New Jack Daniel received $2,845,574.76 in cash upon the liquidation of Old Jack Daniel. In addition, there were also received accounts receivable worth $527,630.53 and a life insurance policy with a cash surrender value of $17,432.85. By 1956 orders from distributors exceeded the supply of Jack Daniel whiskey and allocation had to be made among the distributors, in part because of a production cutback in 1954. The Jack Daniel whiskeys were then the highest priced domestic whiskeys *with the highest profit to the distiller.*

Here there was a reasonable expectation that the amounts advanced would be repaid (Finding 68) and Brown-Forman had contributed a substantial amount of equity capital to plaintiff. These two factors are important in plaintiff's favor.

"Essential to the creation of a debtor-creditor relationship is the existence of a reasonable expectation of repayment at the time of the transaction." Irbco Corp. v. Commissioner, 25 CCH Tax Ct. Mem. 359, 366 (1966); accord Earle v. W. J. Jones & Son, supra, n. 22. Mr. Sam Fleming, President of the Third National Bank in Nashville, a bank which participated in the loan to Brown-Forman, testified that " * * * barring some unforeseen event, like prohibition or depression, * * * they [New Jack Daniel] should be able to pay the $3.5 million loan." And, when it was negotiating for its $19.6 million loan, Brown-

Forman prepared sales projections for New Jack Daniel to support the probability of its ability to repay Brown-Forman on time. As it turned out, the projections were conservative when compared with New Jack Daniel's actual sales for the years involved. Finally, the reasonableness of the expectation of repayment was verified by the fact that the loan was repaid in 1963 with interest. In *Irbco Corp.*, supra, at 366, the Tax Court, in emphasizing the fact of actual repayment in determining that a bona fide loan existed, said:

Respondent belittles the significance of the repayments made by Irby & Co. He states that even substantial repayment "doesn't control" as a reflection of what the parties intended when the loan was made, citing [cases]. All of these cases involved repayments, but in none was there a substantial repayment at a time when no further advances were being made. Furthermore, the factual complexions of [the cases cited] are unlike that here present. Two involved advances to new businesses with unproven earning ability. In the other, the borrower had no income in several of the years during which advances were made. These factors overcame the importance of repayments.

The Government argues that the likelihood of ultimate repayment is, as explained in *Affiliated Research,* supra, at 342, 351 F.2d at 648, of much less importance than the question of whether repayment is dependent upon the success of the recipient corporation. Even if this is so, and it is so only with the qualification stated above, it is only one factor to be considered and although there are cases finding an advance to be an equity investment even though there was a reasonable expectation of repayment, Fellinger v. United States, 363 F.2d 826 (6th Cir., 1966), the other factors in this case outweigh this consideration. We note that in *Fellinger,* supra, the lenders had not made a substantial equity invest-

---

22. Earle v. W. J. Jones & Son, 200 F.2d 846, 851 (9th Cir., 1952).

ment in the borrower. Moreover, the case at bar is distinguishable from *Affiliated Research,* supra, on two important grounds: first, the corporation there did not have a substantial amount of equity investment in it, and second, and more important, there was no finding there that there was a reasonable expectation of repayment.

We have found (Finding 66) that "Brown-Forman determined that a capitalization of $2 million would be adequate for plaintiff's needs and that the Old Jack Daniel assets would be sufficient to carry on the distillery business." Brown-Forman had years of experience in the whiskey business and was well qualified to make this judgment. That its judgment was correct is borne out by the following facts: (1) upon the liquidation of Old Jack Daniel plaintiff acquired ample cash to supply its needs for working capital (the approximate amount of which was, of course, known to Brown-Forman when the purchase negotiations were proceeding), (2) Brown-Forman never had to make further advances to New Jack Daniel for the operation of the distillery business, and (3) New Jack Daniel was able to pay the $3.5 million loan with interest in 1963. "There is 'no rule which permits the Commissioner [of Internal Revenue] to dictate what portion of a corporation's operations shall be provided for by equity financing rather than by debt';" Nassau Lens Co., Inc. v. Commissioner of Internal Revenue, 308 F.2d 39, 46 (2d Cir., 1962), the choice is that of the stockholders. Rowan v. United States, 219 F.2d 51, 54 (5th Cir., 1955).

In American Processing and Sales Company v. United States,[23] our latest decision in this area (though specifically dealing with a bad debt situation), before looking at the bona fide nature of the debt in question, we first asked whether the purpose of incorporating the borrower was to perpetrate a tax hoax. Here, as well as there, there were valid business reasons for setting up a new corporation. In the instant case, the Old Jack Daniel stockholders refused to sell the company's assets directly to Brown-Forman. They wanted their former assets and business to be the security for the purchase money notes. The way this desire was fulfilled was by having Brown-Forman set up a new subsidiary to buy the Old Jack Daniel stock, with the subsidiary's stock acting as security for the notes given by it in part-purchase of the old company's stock. In addition, Brown-Forman wished to maintain the local identity of the Jack Daniel business to forestall any adverse public reaction to a change in the control of the business. This was done by incorporating New Jack Daniel as a Tennessee corporation with the same name as Old Jack Daniel, by having New Jack Daniel employ the same officers and personnel as Old Jack Daniel, and by never mentioning Brown-Forman's name in Jack Daniel advertising. It was crucial to the assurance of the continued right to distill Jack Daniel whiskey in Moore County, Tennessee, that the Tennessee identity of the distiller be preserved.

The Government also argues that the burden was on the plaintiff to show that it could have borrowed the $3.5 million from an unrelated source and on the same terms as those actually granted. It is true that the courts have considered this factor in the past. Matthiessen v. Commissioner of Internal Revenue, 16 T.C. 781 (1951), aff'd 194 F.2d 659 (2d Cir., 1952). But the mere fact that a loan could not be obtained from an unrelated source does not preclude the existence of a bona fide loan. *Brighton Recreations, Inc.,* supra, at 135; *American Processing and Sales Company,* supra, n. 23, 371 F.2d at 852. In *Brighton,* supra, the corporation involved was actually unable to secure loans from outside sources, yet countervailing circumstances enable the court to find the existence of a bona fide debt. The case at hand is much stronger (for the taxpayer's position) than those cited for

23. Ct.Cl., January 20, 1967, 371 F.2d 842 (1967).

when Brown-Forman borrowed the $19.6 million from its usual banking sources the latter obviously knew and took into account the fact that $3.5 million of that sum was going to be lent by Brown-Forman to New Jack Daniel. In addition, the Third National Bank of Nashville, after having lent Brown-Forman $792,-000, lent an additional $300,000 to New Jack Daniel, taking in return its *unsecured note*.[24] See *Jaeger Auto Finance*, supra, n. 17.

The most important factor, in our minds, leading to a decision for the plaintiff, is the *obvious awareness of Brown-Forman's bankers that $3.5 million of their loan to Brown-Forman was going to be passed on to the plaintiff*. In substance, the bankers loaned $3.5 million to Brown-Forman in reliance on the fact that while Brown-Forman was going to lend that sum to the plaintiff, it had been satisfactorily established that plaintiff was going to be able to repay that sum in 1963. The bankers were most concerned with Brown-Forman having both a debt and equity position in plaintiff. Had that position been solely equity, as the Government contends it was, Brown-Forman's chance of getting repayment of its advance in case of plaintiff's insolvency would be much less than if it also had a creditor standing. Knowing that the $3.5 million was a loan certainly influenced the bankers' decision in estimating the probability of repayment. This situation is very similar to that in *Oak Motors*, supra, where the Tax Court stated (at p. 524) in allowing the corporate taxpayer an interest deduction on the stockholder's loan:

> For this purpose, [the stockholder Boyte] was a mere conduit and nothing else. The evidence shows that the Third National Bank * * * considered Boyte's advance—and the note which represented it—to be a bona fide debt of petitioner. This is corroborated by the fact that the bank clearly was relying on repayment of petitioner's indebtedness to Boyte to enable Boyte to repay his own loan, in the same amount, to the bank.[25]

So here, the banks were relying upon repayment of New Jack Daniel's debt to Brown-Forman to enable Brown-Forman to fully meet its loan obligation. Brown-Forman needed timely repayment from New Jack Daniel in order to pay its $9.65 million loan. In this situation, to call the advance made to New Jack Daniel one of equity capital would be to ignore the "substance" of the transaction. *Irbco Corp.*, supra, at 366; *Miller's Estate v. Commissioner of Internal Revenue*, 239 F.2d 729, 732–733 (9th Cir., 1956).

Accordingly, the plaintiff is entitled to recover on its petition and the defendant is not entitled to recover on its counterclaim. Judgment is therefore entered for plaintiff.

Since the decision in this case has been limited to the issues of law and fact relating to the right of each party to recover, the amounts of recovery, relying upon our decision herein, will be determined pursuant to Rule 47(c)(2) of the Rules of this court.

24. The record did not establish that New Jack Daniel would or would not have been able to borrow $3.5 million from an unrelated lender on the same terms as those granted by Brown-Forman. We have found (Finding 74) that "[n]o consideration was given to the possibility of having plaintiff borrow a portion of the required $5.5 million from someone other than Brown-Forman, because Brown-Forman's *bankers* wanted all of the outside debt consolidated in the Brown-Forman debt structure with them." This finding justifies giving little weight, if any, to the outside source factor. (Emphasis supplied.)

25. It is to be noted that the note given by the corporation to Boyte was subordinated to the rights of *all* of the corporation's other creditors. *Oak Motors*, supra, at 522.