**KNAPP KING–SIZE CORP. and Knapp Brothers Shoe Manufacturing Corp.**

v.

**The UNITED STATES.**

Nos. 9–73 and 203–73.

United States Court of Claims.

Dec. 17, 1975.

Chester M. Howe, Boston, Mass., attorney of record, for plaintiff.

Allan C. Lewis, Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, for defendant; Theodore D. Peyser, Jr., Washington, D. C., of counsel.

Before COWEN, Chief Judge, and SKELTON and BENNETT, Judges.

## OPINION

PER CURIAM:

These cases come before the court on plaintiffs' motion, filed September 25, 1975, requesting that the court adopt, as the basis for its judgment in these cases, the recommended decision of Trial Judge Philip R. Miller, filed May 9, 1975, as modified by the Supplemental Opinion, filed August 13, 1975, pursuant to Rule 134(h). Both opinions have now been consolidated in one opinion and defendant has filed no notice of intention to except thereto. Upon consideration thereof, without oral argument, since the court agrees with the recommended decision as hereinafter set forth, it hereby adopts the basis for its judgment in this case.

*It is therefore ordered and concluded,* as a matter of law, that the court has jurisdiction of these cases and that plaintiffs are entitled to recover. Judgments are entered for plaintiffs to that effect with the amount of their recoveries to be determined in further proceedings pursuant to Rule 131(c); and

*It is further ordered* that the order issued November 21, 1975, is, in view of the issuance of this opinion per curiam, hereby withdrawn.

## OPINION OF TRIAL JUDGE

MILLER, Trial Judge:

These are suits for refund of federal corporate income taxes and interest paid by Knapp Brothers Shoe Manufacturing

Corp. (Knapp Bros.) and its successor in interest, Knapp King-Size Corp. (Knapp), of Brockton, Massachusetts, in the sums of $779,460 and $58,773, for the years 1967 and 1968. The only question at issue is the determination of the portion of the purchase price paid for an entire business which may be attributed to the inventory.

On December 20, 1966, Knapp Bros. purchased all of the outstanding stock of King-Size Inc. (King-Size) from its stockholders. Ten months later, on October 31, 1967, Knapp Bros. liquidated King-Size and took over all of its assets in its own name. For the calendar year 1967, Knapp Bros. filed a consolidated income tax return with King-Size, including therein all income and deducting all costs and expenses from the operation of King-Size prior to its liquidation.

Section 334(b)(2) of the Internal Revenue Code of 1954 treats such an acquisition and liquidation as a purchase of the assets at the price which the acquiring company paid for the stock, with adjustments for the intervening financial results of operations during the 10-month period. The adjusted basis as of October 31, 1967, is agreed to be $5,347,725. The parties have also agreed that the proper allocation of basis to the assets other than the inventory and goodwill is $755,761. This leaves for determination only the relative portions of the remaining $4,591,964 to be attributed to the inventory and goodwill. The parties have further agreed that whatever value is determined for the inventory the residue is allocable to goodwill. The portion attributed to inventory represents the cost of goods sold for purposes of determining Knapp Bros.' income from the sale of merchandise for the years at issue.

Prior to December 20, 1966, Knapp Bros. was exclusively in the shoe business, both as a manufacturer and distributor, selling through a chain of retail stores, at wholesale and by mail order. King-Size was also located in Brockton and was exclusively a retail distributor of men's apparel and accessories, 92 percent of its sales being by mail order. It was the sole national mail-order distributor dealing exclusively in wearing apparel and accessories for men who were above average in height and weight. Its customers for the most part were over 6 feet 2 inches in height and weighed in excess of 200 pounds. It did no manufacturing but purchased all of its merchandise from standard manufacturers, modifying their specifications, however, to suit the needs of its unusual clientele. King-Size had a 600,000 name customer list which it had amassed by soliciting applicants for its catalogs through advertising in national periodicals at an average cost of about $3 per name. The executives of Knapp Bros. were of the view that King-Size's mail-order trade for large sized men's apparel could be used to complement Knapp Bros. own mail order shoe business.

The negotiations for the purchase of the King-Size stock began in January 1966 and culminated in a verbal agreement by September 1966. There were no negotiations with respect to the price of specific assets nor any attempt to put values on such assets. The price was essentially arrived at by capitalizing King-Size's earnings at a 10 percent rate. A basic $3,700,000 price represented 10 times the earnings for King-Size's fiscal year ending October 31, 1966; but it was subject to increases up to $4,500,000 if in any of the 3 ensuing years the earnings increased to levels that would warrant such price upon application of the same multiple. In fact the earnings did increase and the aggregate purchase price did become $4,500,000. The kinds of adjustments which increased the basis to $5,347,725 are explained in the discussion of the statute, *infra.*

King-Size customarily acquired its inventory from approximately 50 to 100 manufacturers of men's apparel and accessories. Its principal selling vehicles were its fall and spring catalogs, which required extensive preparation. Each of these catalogs had five different editions. For example, the original fall catalog, the October issue, was mailed out in the latter part of September, but vari-

ations thereof with different emphasis on the same merchandise were mailed out in the last weeks of October, November, December and January. The latter two also contained price reductions necessary to sell slower moving seasonal and fashion merchandise.

Because of the special requirements of its customers as to size, weight and durability and because of the long lead time required for catalog sales, King-Size's preparations for each season began many months prior to the publications. It would solicit new resources up to 15 months in advance to ascertain their willingness and capability to manufacture the required merchandise at acceptable prices. In December it would contact acceptable manufacturers for selection of fabrics and styles for the following October catalog. In January it would select the specific items for presentation in the fall catalogs. In January and February it would advise the resources of the models and piece goods selected and the desired specifications. The manufacturers would then make up and submit pilot samples for approval. In February and March King-Size would place orders for all of the fashion items and 75 to 80 percent of the basic items for the fall season. The manufacturers would produce the merchandise from March through September and make deliveries to King-Size's warehouse from August through October and as needed. The end of October represented King-Size's peak inventory accumulation period.

Preparation of the fall catalogs began in February or March upon receipt of the pilot samples and models. The catalogs required illustrations, photographs and artwork, editorial work, composition and other preparations over 5 to 6 months prior to publication.

King-Size uniformly did not pay its suppliers for the inventory on hand on October 31 until November 10. On the other hand, its customers paid cash in advance for their orders.

King-Size's cost for its October 31, 1967 inventory was $1,473,978. Its aggregate retail catalog price for the same merchandise was $3,096,000. In view of the manner in which it accumulated its inventory it is clear that substantially all of it was purchased well after December 20, 1966, when Knapp Bros. acquired the stock of King-Size.

Both parties tried the case on the assumption that the sole issue was the fair market value of the King-Size inventory on October 31, 1967. However, the statutory scheme and purpose raise a reasonable question as to the correctness of that assumption. Section 334(b)(2) provides that if a corporation purchases 80 percent of the total number of shares of stock of another corporation during a 12-month period and if the purchasing corporation receives the property of the acquired corporation in a complete liquidation pursuant to a plan adopted not more than 2 years after the purchase, then the basis of the property in the hands of the distributee shall be the adjusted basis of the stock with respect to which the distribution was made. The statute further provides that under regulations prescribed by the Secretary of the Treasury or his delegate proper adjustment in the adjusted basis of any stock shall be made for any distribution made to the distributee before the adoption of the plan of liquidation, for any money received, for any liabilities assumed or subject to which the property was received, and for other items.

Section 334(b)(2) was adopted for the first time in the Internal Revenue Code of 1954. Senate Report No. 1622, 83d Congress, 2d Session, page 48 (3 U.S. Code Cong. & Admin.News, p. 4679 (1954)) stated the purpose of the section.[1]

Under the House bill, a shareholder would in all cases be permitted to re-

---

1. House Report No. 1337, 83d Congress, 2d Session, page 38 (3 U.S.Code Cong. & Admin. News, p. 4063 (1954)) stated substantially the same as the first two sentences in the Senate report.

ceive the purchase price for his stock as his basis for the assets distributed to him regardless of the assets' cost to the corporation. In this respect the principle of *Kimbell-Diamond Milling Company* (187 F.2d 718) was effectuated. Since the application of the rule of this case is primarily in the area of liquidations by a parent corporation of its subsidiary, the rule has been limited by your committee to liquidations of this type. Accordingly, your committee has provided that where a corporation purchases the stock of another corporation and within 2 years after the purchase a plan of liquidation is adopted, the basis of the assets of the subsidiary received by the parent will be the amount paid for the subsidiary's stock.

The bill was amended in conference to provide for limited adjustments to basis for events between the stock acquisition and liquidation dates, the Committee explaining (H.Conf.Rep. No. 2543, 83d Cong., 2d Sess. 36, U.S.Code Cong. & Admin.News, p. 5295 (1954):

Under section 334(b)(2), which relates to the so-called "Kimbell-Diamond" problem, a parent corporation which liquidates it subsidiary (the stock of which was purchased within the time and in the manner prescribed) receives the assets of the subsidiary at the same basis at which the parent held the subsidiary stock, subject to certain adjustments. Under the Senate amendment, the only adjustment expressly provided for was an adjustment for distributions made to the parent with respect to the stock of the subsidiary before the adoption of the plan of liquidation. Under the amendment recommended in the accompanying conference report, it is provided that, under regulations prescribed by the Secretary or his delegate, proper adjustment will be made not only for such distributions, but also for any money received by the parent corporation, for liabilities, and for other items.

*Kimbell-Diamond Milling Co. v. Commissioner,* 14 T.C. 74 (1950), *aff'd,* 187 F.2d 718 (5th Cir. 1951), *cert. denied,* 342 U.S. 827, 72 S.Ct. 50, 96 L.Ed. 626 (1951), referred to in the committee reports, holds that where one corporation purchases the stock of another with the intent of acquiring the latter's assets by liquidation of the acquired corporation, and in fact liquidates it, the intermediate steps may be disregarded and the entire transaction treated as a purchase of assets at the purchaser's cost of the stock, and such price will be deemed the purchaser's basis of the assets for sale, depreciation and other purposes. Section 334(b)(2) differs in some respect from the *Kimbell-Diamond* rule. It is confined to corporate purchasers, it applies to a purchase of 80 percent of the stock, it does not depend upon the purchaser's subjective intent, it sets limits on the time periods for actions, and it delegates to the Treasury the responsibility for issuing necessary regulations to fill in the details for appropriate adjustments to basis up to the liquidation. *See American Potash & Chem. Corp. v. United States,* 399 F.2d 194, 206–09, 185 Ct.Cl. 161, 180–84 (1968).

Treasury Regulations on Income Tax, section 1.334–1(c)(4), provides that for purposes of this statute only, the following adjustments shall be made to the adjusted basis of the subsidiary's stock in the hands of the parent.

1. A reduction for distributions received by the parent from the subsidiary during the period between the purchase of the stock and liquidation, out of other than post-purchase earnings and profits.

2. An increase for the amount of any unsecured liabilities assumed by the parent.

3. An increase for the subsidiary's undistributed earnings and profits between the dates of purchase of the stock and the liquidation.

4. A decrease by the amount of any cash and its equivalent received by the parent.

5. A further decrease by the portion of the subsidiary's deficit in earnings and profits between the purchase and liquidation dates.

With respect to property held on the date of the stock purchase, gain or loss on sales and other items determined by reference to basis, the adjustments are to be computed by substituting for the book basis the parent's adjusted basis for the stock allocable to such property.

Adjustments to the basis of the stock prescribed by section 334(b)(2) are confined by the regulations to distributions of funds or to completed transactions which gave rise to realized increases or decreases in earnings and profits. The apparent rationale is that if a corporation realizes earnings it has additional funds and additional basis for assets in excess of what it had at the time the parent purchased the stock. The converse is true if the subsidiary sells property at a loss.

Leading tax treatises describe the scheme of the regulations as follows:

[R]egs. 1.334–1(c)(4) attempts to put the parent in essentially the same position, for basis purposes, as if the subsidiary had been liquidated immediately after the parent purchased its stock. [BITTKER AND EUSTICE, FEDERAL INCOME TAXATION OF CORPORATIONS AND SHAREHOLDERS ¶ 11.45, at 11–40 (3d ed. 1971).]

The adjustments reflected in the series of complex rules described in this section have as their purpose the objective of producing the same results asset-wise as would have been produced had the parent purchased the assets directly in the first instance. [3A J. MERTENS, JR., LAW OF FEDERAL INCOME TAXATION § 21.168, 482 n. 20.]

Where there is a delay in liquidating the acquired corporation, Regs. section 334–1(c)(4) require that certain adjustments be made to the basis of the acquired corporation's stock in the hands of the acquiring corporation, prior to allocation of that basis among the assets received upon subsequent liquidation of the acquired corporation. The purpose of the adjustments, in general, is to approximate the result that would have been produced had the acquiring corporation liquidated the acquired corporation immediately. * * * [SURREY, WARREN, McDANIEL, AULT, FEDERAL INCOME TAXATION 502 (1973).]

The next problem with which the regulation deals is the fair allocation of the aggregate adjusted basis to the various classes of assets the parent receives when it decides to liquidate the acquired subsidiary. Regulations section 1.334–1(c)(4) prescribes the method of allocation as follows:

(viii) * * * [T]he amount of the adjusted basis of the stock adjusted as provided in this paragraph shall be allocated as basis among the various assets received (except cash and its equivalent) * * * . Ordinarily, such allocation shall be made in proportion to the net fair market values of such assets on the date received * * * .

The quoted portion of the regulations provides that except for cash and its equivalent *ordinarily* allocation of the adjusted basis to the assets shall be made in proportion to the fair market value of such assets on the date received. The use of the term "ordinarily" presupposes that there are some cases where the fair market value is not a proper basis for allocation. Such a case might conceivably be one where the acquiring corporation has its wholly owned subsidiary use cash or credit to purchase other assets after the parent already owns the subsidiary.

If the purpose of section 334(b)(2) and the regulations thereunder is to put the parent in essentially the same position as if it had liquidated the subsidiary the day after it purchased the subsidiary's stock, does the statutory purpose permit the parent to use anything other than the cost of subsequently acquired inventory as its basis for that inventory? Plaintiffs claim here that after the parent had the subsidiary sell off the old inventory it could have it buy new in-

ventory, and the regulation would allow the parent to boost the $1,473,978 cost of the new to a $3,069,000 basis (equivalent to the projected retail selling price) and avoid any income tax on the difference. While it is true that this increased allocation of basis for inventory would cause an off-setting reduction in the basis for goodwill, that would be unlikely ever to be reflected in future taxable income.

The deficiency assessments were apparently made on the assumption that the basis of new inventories purchased after acquisition of the company is cost, since the Commissioner of Internal Revenue determined that Knapp Bros.' basis for the inventory is $1,473,978. The case having been tried and briefed by both parties, however, on the theory that the issue was only one of determining the fair market value of inventory on the date of liquidation, without explanation as to the reason for abandonment of the Commissioner's determination, an inquiry was addressed to them seeking their views as to whether under the statute and regulations the cost of the newly acquired inventory rather than its fair market value should be used in determining the parent's income from the sale of the merchandise after liquidation of the subsidiary. Defendant (as well as plaintiffs) responded that the regulations should be construed to require the use of fair market value for all assets (other than cash) received on liquidation, regardless of when they were purchased.

Defendant's motion for reconsideration of this portion of the original opinion furnishes the rationale which defendant failed to supply earlier. It points out that if on the day after the acquisition of the stock the acquiring corporation had liquidated the acquired corporation and sold the inventory immediately it would have had no taxable income from the sale, since its basis for the inventory, the fair market value, would presumably have been the same as the selling price. However, when an acquiring company does not immediately liquidate the acquired company but allows it to remain in business as a wholly owned subsidiary through the period of an inventory cycle and to sell the original inventory in its own name, they do not enjoy the advantage of the stepped up inventory basis and the subsidiary incurs a liability for income tax on the difference. Therefore, defendant explains, by treating the new inventory as replacement for the old and allowing the taxpayer to substitute a stepped up basis for the new inventory acquired with the proceeds of the old, the acquiring corporation receives the rough equivalent of the tax benefit it would have had on immediate liquidation of the subsidiary.

This is not a wholly satisfying explanation, since the new inventory for which defendant allows a stepped up basis is not limited by the regulation to that which is in replacement for the old. It may be in addition to the old or many times as large as the old. Indeed it may not have been acquired with the proceeds of sale of any of the old assets but wholly on credit to be paid out of proceeds of sale of the new. However, it cannot be said that the regulation, as interpreted by defendant, is so incompatible with the statutory purpose as to be invalid.

■■■ As already noted the statute authorizes the Secretary of the Treasury or his delegate to prescribe regulations with respect to the adjusted basis of the stock and for other items. Such express delegated authority for filling in the gaps in a complicated statute is not merely interpretative. *Cf. Charles Ilfeld Co. v. Hernandez,* 292 U.S. 62, 65, 54 S.Ct. 596, 78 L.Ed. 1127 (1934). It is deemed to give wide discretion to the Secretary in the application of his expert knowledge of the problems the statute was designed to meet. *Bingler v. Johnson,* 394 U.S. 741, 749–51, 89 S.Ct. 1439, 22 L.Ed.2d 695 (1969); *United States v. Correll,* 389 U.S. 299, 306–07, 88 S.Ct. 445, 19 L.Ed.2d 537 (1967); *Woolford Realty Co. v. Rose,* 286 U.S. 319, 330–31, 52 S.Ct. 568, 76 L.Ed. 1128 (1932); *Coca-Cola Bottling Co. v. United States,* 487 F.2d 528, 532, 203 Ct.Cl. 18, 26 (1973). If the Treasury, which has the primary re-

sponsibility for protecting the internal revenue, disclaims the benefits of an interpretation of its own regulations favorable to defendant's litigating position, it is questionable whether the court should impose it on defendant, at least for purposes of this case. Accordingly, without deciding that the statute *requires* a regulation having the meaning conceded by defendant, in light of the Treasury's own interpretation of its regulations it is held that plaintiffs are entitled to use as their allocated basis for the King-Size inventory its fair market value as October 31, 1967.

Plaintiffs urge first that the fair market value of the inventory is $3,096,000, its aggregate retail catalog price without any deductions whatsoever. They urge further, that they are entitled to include as well in their inventory basis goods on order and not yet received, on the theory that this is likewise an asset of the plaintiffs. This would boost the aggregate basis claimed by plaintiffs to a maximum of $4,150,000. The $3,096,000 valuation is not supported by the testimony of any of plaintiffs' expert witnesses. The inclusion of the goods on order is apparently an afterthought because it was never mentioned in the course of the proceedings through trial. Lastly and alternatively, plaintiffs urge a fair market value of $2,678,000 for the inventory on hand on October 31, 1967, which represents $3,096,000 less $417,685, repre-

senting the cost of its disposition after October 31. The last is the only valuation supported by the testimony of its expert valuation witnesses, John Eppich, a partner in the accounting firm of Arthur Young and Company, and Frank M. Stotz, a partner in the accounting firm of Price Waterhouse & Company.

As its authority for using the aggregate retail catalog price, the $3,096,000, as the fair market value of the inventory, plaintiffs rely primarily upon a truncated extract from the regulations on estate tax (Treas.Reg. § 20.2031—1(b)). However, the section relied on, set out in the footnote,[2] is not helpful. It deals with the estate tax valuation of a particular item, such as an automobile, owned by a decedent who was a member of the general public, not a dealer, at the time of his death. It concludes that the estate tax valuation of such an item, generally obtained by the public in the retail market, is the retail price. With respect to inventory held by a decedent for sale in the course of business the regulation refers to a different section dealing with valuation of interests in businesses.

As their next authority in support of the claim that the fair market value of its inventory should be the aggregate retail price plaintiffs cite the regulations with respect to deductions from income for charitable contributions of property.[3]

**2.** "The fair market value of a particular item of property includible in the decedent's gross estate is not to be determined by a forced sale price. Nor is the fair market value of an item of property to be determined by the sale price of the item in a market other than that in which such item is most commonly sold to the public, taking into account the location of the item wherever appropriate. Thus, in the case of an item of property includible in the decedent's gross estate, which is generally obtained by the public in the retail market, the fair market value of such an item of property is the price at which the item or a comparable item would be sold at retail. For example the fair market value of an automobile (an article generally obtained by the public in the retail market) includible in the decedent's gross estate is the price for which an automobile of the same or approximately the same description, make, model, age, condition, etc., could

be purchased by a member of the general public and not the price for which the particular automobile of the decedent would be purchased by a dealer in used automobiles. * * The value of items of property which were held by the decedent for sale in the course of a business generally .should be reflected in the value of the business. For valuation of interests in businesses, see § 20.2031–3."

**3.** Treas.Reg. § 1.170–1(c) provides: "*Contribution in property*—(1) *General rules.* If a contribution is made in property other than money, the amount of the deduction is determined by the fair market value of the property at the time of the contribution. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. If the contribu-

However, these regulations are likewise of questionable pertinency. As this court pointed out in *Sheppard v. United States,* 361 F.2d 972, 977, 176 Ct.Cl. 244, 255 (1966), Congress, in an effort to encourage contributions to charities, has approved a policy of permitting donors to deduct gifts of appreciated property without reporting the appreciation as income. Deduction of the value at which a donor customarily sells the item he donates is merely an application of the same congressional policy to property which is a part of the donor's stock-in-trade. *See Campbell v. Prothro,* 209 F.2d 331, 336 (5th Cir. 1954); *Singer Co. v. United States,* 449 F.2d 413, 196 Ct.Cl. 90 (1971), and *Threlfall v. United States,* 302 F.Supp. 1114 (W.D.Wis.1969). No such policy is applicable to an arms-length sale of a business, where the buyer acquires the entire inventory in bulk and both buyer and seller arrive at the aggregate price on the assumption that the buyer will continue to operate the business and sell the stock-in-trade in the usual course of business at a profit.

The more pertinent regulation dealing with the fair market value of inventory is Treasury Regulation 1.471–4, which provides as follows:

> Inventories at cost or market, whichever is lower.

> (a) Under ordinary circumstances and for normal goods in an inventory, "market" means the current bid price prevailing at the date of the inventory for the particular merchandise in the volume in which usually purchased by the taxpayer, and is applicable in the cases—

> (1) Of goods purchased and on hand,

> \* \* \* \* \* \*

> (b) Where no open market exists or where quotations are nominal, due to

inactive market conditions, the taxpayer must use such evidence of a fair market price at the date or dates nearest the inventory as may be available, such as specific purchases or sales by the taxpayer or others in reasonable volume and made in good faith, or compensation paid for cancellation of contracts for purchase commitments. Where the taxpayer in the regular course of business has offered for sale such merchandise at prices lower than the current price as above defined, the inventory may be valued at such prices less direct cost of disposition, and the correctness of such prices will be determined by reference to the actual sales of the taxpayer for a reasonable period before and after the date of the inventory. \* \* \*

The same provisions have appeared in substantially identical form in every regulation on income taxes since article 1584 of regulations 62 under the Revenue Act of 1921 (42 Stat. 227). In *D. Loveman & Son Export Corp.,* 34 T.C. 776, 796 (1960), *aff'd,* 296 F.2d 732 (6th Cir. 1961), the court held:

> [T]he term "market," in the phrase "lower of cost or market," means the price which petitioners would have had to pay to replace items in their inventories on the applicable inventory dates. Conversely, it does not mean the price at which such merchandise is resold or offered for resale. *Elder Mfg. Co. v. United States,* 10 F.Supp. 125 [80 Ct.Cl. 666] (Ct.Cl.); *Ideal Reversible Hinge Co.,* 7 B.T.A. 1066; see also *Frederick A. Stearns,* 8 B.T.A. 884, 887; *Charles N. Winship,* 10 B.T.A. 237, 240. This point is recognized in the regulations by the specific reference therein to "*bid price* \* \* for the particular merchandise in the volume in which usually *purchased* by the taxpayer* \* \* \*.*" (Emphasis

tion is made in property of a type which the taxpayer sells in the course of his business, the fair market value is the price which the taxpayer would have received if he had sold the contributed property in the lowest usual market in which he customarily sells, at the time and place of the contribution (and in the case of a contribution of goods in quantity, in the quantity contributed). The usual market of a manufacturer or other producer consists of the wholesalers or other distributors to or through whom he customarily sells, unless he sells only at retail in which event it is his retail customers. \* \* \*."

[court's].) In short, we are concerned here with petitioners' *replacement* market and not their resale market. * * * [Emphasis court's.]

And *see also Bedford Mills, Inc. v. United States,* 2 F.Supp. 769, 77 Ct.Cl. 190, *cert. denied,* 290 U.S. 655, 54 S.Ct. 71, 78 L.Ed. 567 (1933), wherein the court held that the market value of finished goods produced by a manufacturer is the reproductive cost on the inventory date.

■ These long standing regulations, having survived repeated reenactments of the revenue laws without substantive change, may be deemed to have been approved by Congress and to have the force of law. *Fribourg Nav. Co. v. Commissioner,* 383 U.S. 272, 283, 86 S.Ct. 862, 15 L.Ed.2d 751 (1966); *Helvering v. Winmill,* 305 U.S. 79, 83, 59 S.Ct. 45, 83 L.Ed. 52 (1938); *Cammarano v. United States,* 358 U.S. 498, 510, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959).

The regulations under section 334(b)(2) do not define fair market value nor do they discuss the nature of the market.[4] Reflection on the purpose of the statute would seem to indicate that Congress intended a definition of fair market value which is neither that applicable to charitable contributions nor that applicable to inventory accounting by an original purchaser or manufacturer of merchandise. It is clear that the scheme and effect of section 334(b)(2) does permit the stockholders of an acquired corporation to obtain at least a degree of inventory profits in the price for which they sell their stock, and accordingly allows the purchaser a stepped-up basis in the same amount. *Jack Daniel Distillery v. United States,* note 4 *supra.* But this does not mean that without saying a word to that effect, either Congress or the Treasury in its regulations meant to overturn the long established rule that for tax purposes the market in which a dealer or manufacturer must value his inventory is not his resale market. To allow the purchaser of an entire business to allocate the retail value of the merchandise as its basis for resale in the ordinary course of the continuing operations would be to impute to Congress the intent to require neither the seller of the business nor the purchaser to pay income tax on the ordinary distribution of the inventory—an intent completely foreign to the purpose of section 334(b)(2).

The use of the reproduction cost starting point rather than retail price is also in accord with economic reality. The hypothetical willing buyer of inventory, the principal value of which is the aggregate proceeds he can obtain for it on ultimate distribution, can hardly be expected to ignore what it would cost him to buy the merchandise directly from the manufacturers rather than from the hypothetical seller. Nor is he likely to invest his money absent an opportunity for markups and profits in the range generally earned in such businesses or comparable ones having similar risks. Of course there are always special situations, such as here, where the whole range of sizes, fashions and varieties which make up the inventory and add to its salability cannot be accumulated except over a considerable lapse of time and require expenditures for planning and designing. It is for such reasons that in valuing a bulk inventory acquisition replacement cost should be only a base or starting point. In other words, the hypothetical willing seller here might be expected to demand a price for the inventory which would compensate him not only for the current cost of its replacement but also would give him a fair return on his expenditures over a period of several months in accumulating and preparing the inventory for distribution. Conversely, the purchaser would have to

---

**4.** In *Jack Daniel Distillery v. United States,* 379 F.2d 569, 574, 180 Ct.Cl. 308, 315 (1967), a case involving a determination of the value of inventory under the same statute, the court referred to the standard legal definition of fair market value as "the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy or sell, and both being reasonably informed as to all relevant facts."

take into account that his purchase price would include the benefit of the seller's prior expertise in planning, designing and getting ready to promote and facilitate the sale of the merchandise at a profit in the near future and would expect to pay for that together with a fair return on it.

It is, however, difficult to apply such rationale to inventory acquired by the subsidiary after the parent already owned all the outstanding stock. The parent, having borne the financial burden of purchasing the inventory in the same way as if it had bought it directly, even if the parent is not limited to its cost basis, no reason is apparent why it should be entitled to use a market value other than replacement, just as any other distributor is required to do. The parent has already received deductions from income for the subsidiary's expenditures in preparation for the sale of the merchandise (*e. g.,* for planning, advertising, catalog preparation, etc.) in their consolidated return, and to allow it an additional increase in its cost of goods. sold for a contribution to value attributable to the same expenses would in effect allow plaintiffs "the practical equivalent of double deduction", contrary to one of the fundamental principles of the tax laws. *Charles Ilfeld Co. v. Hernandez,* 292 U.S. 62, 68, 54 S.Ct. 596, 598, 78 L.Ed. 1127 (1934). And *see also United States v. Skelly Oil Co.,* 394 U.S. 678, 684, 89 S.Ct. 1379, 22 L.Ed.2d 642 (1969); *Missouri Pacific R. R. v. United States,* 337 F.2d 637, 640, 167 Ct.Cl. 725, 729–30 (1964), and *Cities Service Oil Co. v. United States,* 462 F.2d 1134, 1137–38, 199 Ct.Cl. 89, *cert. denied,* 409 U.S. 1063, 93 S.Ct. 558, 34 L.Ed.2d 517 (1972).

For reasons not clear from the record defendant made no effort to value the inventory by any reference to replacement cost. Conceivably this may have been because its sole expert witness foundered and defendant repudiated his testimony, leaving it without any opinion testimony as to value whatsoever.[5]  In

any event, in its brief defendant has adopted the testimony of plaintiffs' expert witnesses which is based on aggregate retail catalog prices less cost of disposition, but with certain adjustments in the figures and an allowance for a potential profit to the willing buyer. Correctly applied, this valuation method, by working backward, should arrive at close to the same value as by adjusting replacement cost.

Plaintiffs contend that the actual sales to its catalog customers without any deductions whatsoever must be the measure of fair market value of the inventory, because it was the highest and best use and because there was no active market for the sale of such inventory in bulk except at distress prices. However, the argument might be made in substantially every acquisition of an entire business that the highest and best use of the inventory is in sales to the regular retail customers of the acquired company, since the inventory of most distributors is acquired to sell in the market which it customarily serves. If the actual retail prices to be realized in the regular course of business were the only suitable measure of the fair market value of the inventory, the requirement of the regulations that the property be valued as of the time of receipt would be an empty gesture, and a company acquiring all of the assets of another would rarely have any taxable income from the sale of the acquired stock-in-trade. It is precisely for these reasons that in the context of such a valuation it becomes necessary to set up a hypothetical willing buyer and willing seller to reconstruct fair value as of the particular date. *Cf. McCormac v. United States,* 424 F.2d 607, 191 Ct.Cl. 483 (1970).

Plaintiffs claim support for their theory in *United States v. Cartwright,* 411 U.S. 546, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973). In *Cartwright,* the Supreme Court held that shares of a mutual fund, which are purchasable only at the approximate fractional value per share of

---

**5.** Defendant states in its brief that "The Government has abandoned the opinion of its

expert inasmuch as it was not supported by the underlying facts in this case."

the fund's net assets plus a percentage sales charge going to an underwriter but which are redeemable at the fractional value alone, may properly be valued for estate tax purposes at the redemption price. Plaintiffs argue that this provides a rule of valuation of an asset having a limited market only at the actual sales price.

The analogy is not helpful to plaintiffs. First, *Cartwright* dealt with the estate tax valuation of a unique single nonbusiness asset not included in any regulation; whereas the method of valuation of business inventory in general for purposes of income taxation has long been covered by regulations. Second, the Supreme Court did not say that replacement cost should be disregarded but only the sales or loading charges for the mutual shares which did not go to the seller but were a commission paid to a third person, and, as the Supreme Court noted, are ordinarily excluded from value. Third, the mutual fund shares were redeemable by law on the valuation date at a fixed price determinable on that day; whereas King-Size's inventory was salable only over a period of time in the future, and the actual price could vary with the market and customer acceptance of the style, quality and price of the merchandise. Fourth, the mutual fund shares were in effect subject to a restrictive agreement as to the redemption price voluntarily entered into at the time of purchase, and the opportunity of the owner to sell the shares in private trading was virtually nonexistent; while apparel is salable generally at what it can command on the market, even though in the quantities of unusual sizes that plaintiff owned it would require extensive efforts to dispose of it all. Fifth, *Cartwright* did not involve a lower replacement cost nor the possibility of income on the sale of inventory in the regular course of business escaping income taxation.

Defendant suggests the approach taken by the Tax Court in *Kraft Foods Co. v. Commissioner,* 21 T.C. 513, 585 (1954), *rev'd on another issue,* 232 F.2d 118 (2d Cir. 1956). There the National Dairy Products Corporation had acquired the business and assets of the Kraft company in a package deal for a lump sum. The court was faced with the problem of determining what part of the consideration properly represented the cost to National Dairy of the Kraft patents and applications for patents. The Commissioner's expert witness valued the patents on the basis of the royalties paid under licensing agreements. The court rejected that manner of valuation because the patents were a part and parcel of the Kraft enterprises, which had the available means and facilities to use them in its business, and it held that it is in that posture that they should be valued. Defendant suggests that in the absence of direct evidence of bulk sales of similar inventory, the inventory in this case must be valued on the theory that it may be sold to a hypothetical willing buyer having facilities equal to that of the seller for distributing it at retail. This constructive approach to fair value is necessarily to be used if the inventory is to be valued as of October 31, 1967.

Such a willing buyer would not be agreeable to paying the full retail price if he knew that he must incur a loss because there had been no allowance for his cost of disposition. Nor would he be willing to pay a price that would merely return his investment without compensating him for the risks which he must incur during the time it took to make the retail sale and for his loss of opportunity to make profits in other ways during the same period on the amount of his investment. Conversely, the willing seller of inventory for a lump sum could hardly expect to receive as much as the aggregate retail price if he was thereby enabled to shift the burden of the disposition costs and risks which would exist during the period of retail sale and if he could invest the proceeds in equally profitable investments or activities elsewhere.

Since both plaintiffs and defendant use the same starting point for valuation, their differences may be readily

pinpointed. They both agree that the aggregate retail catalog price is $3,096,000. Plaintiff's valuation witness, Mr. Eppich, conceded that he had made no allowance for returns of defective merchandise. The record reflects customer refunds of approximately 3.9 percent, of which an estimated 20 percent was for defective merchandise. Applying these percentages to $3,096,000 in sales results in a $24,000 allowance for net returns.

Mr. Eppich further conceded that his appraisal failed to take into account the fact that a portion of the inventory was sold after Christmas 1967 at reduced prices. Such sales resulted in Knapp Bros. receiving approximately $11,000 less than the retail catalog price for the merchandise. Mr. Eppich also admitted that he did not take into account the fact that the catalog allowed small quantity discounts when two or three items were purchased at a time. Mr. Kelly, president of King-Size, estimated that about 30 percent of sales were for other than single items. Examination of the catalog prices shows the discounts were in the neighborhood of 1½ percent. A conservative estimate would place the discounts on the aggregate sales at $5,000.

Defendant also accepts the testimony of plaintiffs' expert witness that there was at least $417,865 in disposition costs for the inventory on hand October 31, 1967. Defendant properly argues, however, that Mr. Eppich failed to take into account several items which boost the disposition costs to $429,216. Mr. Eppich agreed on cross-examination that some sort of computation might appropriately be made for rental of the warehouse in which the inventory was stored and processed for disposition from November 1967 through January 1968. The annual rental paid by King-Size for two buildings in Brockton was $32,000 plus the assumption of $25,000 in operating expenses. Mr. Eppich testified that at least one building was used exclusively for storing and shipping the inventory. In the absence of more specific evidence a fair estimate of the warehouse rental is 50 percent of the net plus 50 percent of operating expenses other than for heat, electricity and security. This approximates $4,000 during the disposition period. For heat, electricity and security at the warehouse a fair estimate based on 50 percent of such aggregate expenses for the period November 1967 through January 1968 is $4,281.

A rented computer was used to keep track of the disposition and of the remainder of the merchandise, to help decide what to feature in the December and January sales catalogs and to assist in deciding to whom and where such catalogs should be sent. The total computer costs are not in the record, but a fair allocation of 50 percent of computer supplies for the same 3-month period is $2,250. The record further supports a $1,000 allocation for November 1967 through January 1968 as the portion of the insurance premiums attributable to the inventory available for sale during that period.

Most important, the parties differ with respect to an allocation of profit to a willing buyer. Neither plaintiffs nor their witnesses make any allowance whatsoever for profit. Defendant properly takes the view that a willing buyer would discount the price he proposed to pay for the bulk purchase so that on the ultimate resale at retail he could make a reasonable profit. Defendant, having no expert witness to support what it deems a fair allocation of such profit, proposes a 50 percent split between buyer and seller. It computes that 50 percent profit as follows: King-Size's average return of profits to sales was 12.2 percent. On net retail sales of $3,056,097 a return of 12.2 percent and an allocation of 50 percent thereof to the buyer results in $186,422 to the buyer.

The weaknesses in defendant's position are several. First, the 12.2 percent is profit before taxes. In computing the amount of discount from the retail selling price at which the hypothetical buyer would bid he would patently use profits after taxes, because that would be his actual net. Second, the average profit

on sales for a 4-year period ending in 1967 is not more meaningful than the last year's profit because there is no expert testimony that such period is more representative of what is likely to be than the figures from the most recent year. Third, there is no expert testimony to support any opinion as to the fairness of the 50 percent allocation of profits between buyer and seller. But the vulnerability of defendant's estimate of a fair allocation of profits is matched by a complete lack of evidence on the subject by plaintiffs, which take an all or nothing position. Thus it becomes the burden of the fact finder to reconstruct what is fair from all of the evidence in the record.

For the year ended October 31, 1967, King-Size earned $490,967 in net profits after taxes. The record establishes that although King-Size turned over its inventory the equivalent of three times a year, the net retail value of its October 31, 1967 inventory ($3,056,000) was approximately 38 percent of the fiscal year's net sales ($8,013,621). An investor could therefore reasonably assume that such inventory could be sold so as to yield about 38 percent of $490,967 or $186,567. Although King-Size did not actually pay for the inventory because its successor made the payment on November 10, 1967, undoubtedly King-Size had made itself liable for the $1,473,978 cost when it placed the orders in the prior February and March. King-Size also incurred most of the selling efforts by way of preparation of the October catalog which was the most expensive sales catalog, the others being mere variations thereof with similar artwork. There were risks of possible changes in fashion, changes in price levels, increased competition and possible adverse economic conditions generally over a period of up to 8 months. On the other hand, the potential buyer had to put out not only the agreed-on price for the inventory but also the disposal costs. He incurred risks similar to those of the seller plus the possible effect of the seller's misjudgment, but for a lesser period of 2 to 3 months, and he lost the interest on his investment.

A fair appraisal of the relative risks, expenses and efforts already incurred by the seller as against those yet to be incurred in order to realize the aggregate retail price, the investment already put in as against those yet to be made to maintain the sales, as well as the relative time spans under which the seller and buyer had to expose themselves to financial risks, are persuasive that the seller would have demanded two-thirds of the net profit to be made while the buyer would have been willing to accept one-third. This results in a profit to the buyer of $62,189 (one-third of $186,567).

In other words, if a willing buyer had put up $2,502,406 plus most of the $429,000 in disposition costs, he would have assumed the likelihood of obtaining $62,189 profits, which results in a 2.1 percent return on his outlay in roughly 3 months, or over an average exposure of 1½ months. On an annual basis this is an equivalent of about a 16.8 percent return on investment after taxes (at the corporate rate).

Plaintiffs' claim that they are entitled in addition to a basis in the goods on order which had not yet been manufactured or delivered as of October 31, 1967, must be rejected out of hand. Even if it might be deemed property for some purposes, there is no substantial evidence in the record as to its value or that as of October 31, 1967 its value was in excess of plaintiffs' potential liability to pay for it. At that stage any opportunity for increment over potential cost would be a part of the intangible value of the business, which may not be included in the value of other assets for purposes of Regulations section 1.334–1(c)(4)(viii). *See Miami Valley Broadcasting Corp. v. United States*, 499 F.2d 677, 681–82, 204 Ct.Cl. 582, 591–92 (1974).

Both parties purport to find support for their positions in *Jack Daniel Distillery v. United States*, 379 F.2d 569, 180 Ct.Cl. 308 (1967). That case also involved the purchase of a business and the valuation of inventory. However,

the acquired company was not merely a distributor but a manufacturer, the inventory at issue was on hand when the parent purchased the stock, it did not consist of products purchased and sold without processing, and the only inventory valuation at issue was the goods in process consisting of whiskey in bulk and in bottling tanks.[6] The court accepted the buying and selling companies' negotiated values based on insurance underwriters' methods of valuation of the whiskey at various stages of aging. They were interpolations between the value of freshly distilled whiskey deemed to be worth only production cost and the case price of the whiskey in glass. Consideration was given to disposal costs, bottling costs, other expenses, interest factors on investment, and the relative profits allocated to the buying and selling companies as a result of the valuations. While the court did not discuss Treasury Regulation section 1.471–4, nor the cases construing it (neither having been brought to its attention by counsel), its ultimate valuation is not inconsistent with the method employed herein. Precise correlation of the application of principles to two such factually complex and different cases cannot be demanded, "especially when it is remembered that determination of fair market value is basically a factual decision, no matter how complicated the reasoning process involved." *Jack Daniel Distillery, supra,* 379 F.2d at 577, 180 Ct.Cl. at 320.

In summary, the fair market value of the King-Size inventory as of October 31, 1967 is $2,502,406.

### CONCLUSION OF LAW

Upon the findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that the court has jurisdiction of these cases and that plaintiffs are entitled to judgments. The amount of their recoveries will be determined in further proceedings pursuant to Rule 131(c).

6. The Government had accepted the taxpayer's valuation of the bottled whiskey ready for sale so the court had no occasion to pass on it.

*Jack Daniel Distillery v. United States, supra,* 379 F.2d at 577, 180 Ct.Cl. at 320 n. 9, 338, 348.