R. M. Smith, Inc., Petitioner *v.* Commissioner of Internal Revenue, Respondent

Docket No. 478–74      Filed November 29, 1977.

*Kenneth P. Simon,* for the petitioner.

*Joseph M. Abele, Mike Dennis,* and *Michael A. DeLuca,* for the respondent.

### SUPPLEMENTAL OPINION

DRENNEN, *Judge:* The opinion in this case (T.C. Memo. 1977–23) was filed on January 31, 1977. In accordance with Rule 155, Tax Court Rules of Practice and Procedure, respondent filed Respondent's Computation for Entry of Decision on April 6, 1977, and petitioner filed Petitioner's Computation of Tax Pursuant to Decision on April 26, 1977. Because the parties differed in their computations, a hearing was held on May 4, 1977, pursuant to Rule 155(b).

Subsequent to that hearing, with the leave of the Court, petitioner filed Petitioner's Memorandum Brief Supporting Rule 155 Computation on May 10, 1977, and respondent filed his Memorandum Brief for Respondent on August 9, 1977. In this memorandum brief, respondent reconsidered the positions he advanced in his previous statements to the Court and made several modifications. In this August 9, 1977, filing, respondent discussed his new positions and revised his computation of tax.[1]

---

[1] These "modifications" are sufficiently extensive to make the Court wonder what respondent's position will be the next time he addresses these issues.

However, the differences raised in the computations of the parties are not new issues, the raising of which would be precluded by Rule 155 (c) of the Tax Court Rules, but arise in applying the opinion of the Court on the issues considered and decided by the Court in its original opinion.

In an order dated August 11, 1977, each party was given until September 12, 1977, to file a response to the opposing party's memorandum brief. Petitioner filed its response on September 7, 1977, in a document entitled Reply Brief of Petitioner Under Rule 155 Computation. Respondent filed his response on September 12, 1977, in a document entitled Reply Memorandum Brief for Respondent.

Petitioner acquired all the stock of Gilmour Co. as of January 31, 1970. On March 31, 1970, it liquidated Gilmour Co. Respondent determined deficiencies in petitioner's own tax liability and in petitioner's liability as a transferee of Gilmour Co.

The basic disagreement between the parties involves the manner in which to compute petitioner's basis in the former Gilmour Co. assets. To make this computation, it is necessary to make some refinements to petitioner's adjusted basis in the Gilmour stock and then to allocate the adjusted basis, so refined, among the acquired assets.[2] This procedure is dictated by section 334(b)(2),[3] which provides, inter alia, that—

the basis of the property in the hands of the distributee shall be the adjusted basis of the stock with respect to which the distribution was made. For purposes of the preceding sentence, under regulations prescribed by the Secretary, proper adjustment in the adjusted basis of any stock shall be made for any distribution made to the distributee with respect to such stock before the adoption of the plan of liquidation, for any money received, for any liabilities assumed or subject to which the property was received, and for other items.

The parties are not in agreement, first, as to the manner in which to make the refinements to adjusted basis. In this regard, sec. 1.334–1(c)(4)(v), Income Tax Regs., is significant. That section provides:

(v) The adjusted basis of the subsidiary's stock held by the parent with respect to which the distributions in liquidation are made (reduced as in subdivision (i) of this subparagraph)—

(a) Shall be increased— (1) By the amount of any unsecured liabilities assumed by the parent, and

(2) By the portion of the subsidiary's earnings and profits (less the amount

---

[2]In order to avoid the confusion inherent in the terms "adjustments to adjusted basis" and "adjusted adjusted basis," we employ herein the terms "refinements to adjusted basis" and "refined adjusted basis."

[3]All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. In 1954, Congress enacted sec. 334(b)(2) to effectuate principles derived from *Kimbell-Diamond Milling Co. v. Commissioner*, 14 T.C. 74 (1950), affd. per curiam 187 F.2d 718 (5th Cir. 1951), cert. denied 342 U.S. 827 (1951). See S. Rept. 1622, 83d Cong., 2d Sess. 256–257 (1954).

of any distributions therefrom) of the period beginning on the date of purchase and ending upon the date of the last distribution in liquidation attributable to the stock of the subsidiary held by the parent.

(*b*) Shall be decreased:

(*1*) By the amount of any cash and its equivalent received, and

(*2*) By the portion of the subsidiary's deficit in earnings and profits of the period beginning on the date of purchase and ending upon the date of the last distribution in liquidation attributable to the stock of the subsidiary held by the parent.

The parties are also not in agreement as to the manner in which petitioner's adjusted basis in the Gilmour stock (as refined) is to be allocated among the acquired Gilmour assets. In this regard, sec. 1.334–1(c)(4)(viii), Income Tax Regs., provides in pertinent part:

the amount of the adjusted basis of the stock * * * shall be allocated as basis among the various assets received (except cash and its equivalent) both tangible and intangible (whether or not depreciable or amortizable). Ordinarily, such allocation shall be made in proportion to the net fair market values of such assets on the date received * * *

The specific points which remain in contention between the parties are discussed in the sections which follow.

## *Calculation of the Value of Intangibles*

Under the provisions of section 1.334–1(c)(4)(viii), Income Tax Regs., set forth above, the amount of the parent's refined adjusted basis in the subsidiary's stock is allocated among the various assets received upon liquidation, both tangible and intangible. This allocation is ordinarily made in proportion to the net fair market values of the assets.

Thus, before there can be an allocation of petitioner's refined adjusted basis (in the Gilmour Co. stock it purchased), it is first necessary to ascertain the fair market values of all of the Gilmour Co. assets petitioner acquired.

The fair market values of the tangible assets involved herein either have been stipulated by the parties or have been the subject of findings by the Court. The fair market value of the intangibles is, as stated in our opinion (T.C. Memo. 1977–23), to be calculated pursuant to the residual method of valuation.

In its computation under Rule 155, petitioner arrived at the fair market value of the intangibles by calculating the total amount it paid for the Gilmour Co. Stock ($3,780,550) and by

subtracting from that amount the total fair market values of the tangible assets. The amount remaining was, according to petitioner, the fair market value of the intangibles.

In his initial Rule 155 computation, respondent employed a quite different method. However, in his memorandum brief, filed August 9, 1977, respondent's approach is more closely in line with petitioner's. The major difference now between the parties' methods of calculating the value of the intangibles is that respondent increases the $3,780,550 cost figure for the Gilmour Co. stock by adding to it the following amounts:

(1) $159,451.93, reflecting Gilmour Co.'s existing liabilities assumed by petitioner; and

(2) $112,729, reflecting Gilmour Co.'s tax liability under sections 1245 (depreciation recapture) and 47 (investment credit recapture) of the 1954 Code.[4]

Respondent believes it is proper to increase the $3,780,550 cost figure by these two amounts because petitioner knew of these liabilities and must have assumed that the total fair market value of the assets it acquired equaled at least $4,052,730.93 ($3,780,550 plus $159,451.93 and $112,729).

We agree with respondent. We believe that the proper application of the residual valuation method requires the use of a cost figure which reflects the total consideration paid. In *Florida Publishing Co. v. Commissioner*, 64 T.C. 269 (1975), affd. without published opinion 552 F.2d 367 (5th Cir. 1977), this Court applied the residual method (see 64 T.C. at 274, 280) and employed as a cost figure "a total consideration of $1,590,956.52 consisting of $1,500,000 in cash and the petitioner's assumption of $90,956.52 in liabilities of the selling corporation." 64 T.C. at

---

[4]By increasing the $3,780,550 starting figure, respondent obtains a greater value for intangibles and thereby reduces the extent to which refined adjusted basis will be allocated to the tangible (and depreciable) assets. In this regard, it is important not to confuse refined adjusted basis with the cost figure under discussion. The latter figure is essential herein only for the purpose of placing a value on intangibles under the residual valuation method. Once intangibles are assigned a fair market value, the refined adjusted basis (determined in accordance with sec. 1.334–1(c)(4), Income Tax Regs.) is allocated among all assets, tangible and intangible, in proportion to their respective fair market values. Sec. 1.334–1(c)(4)(viii), Income Tax Regs.

272–273.[5] Among these liabilities were "payroll taxes payable" and "accrued property taxes."

We believe a similar result should obtain on the facts of the instant case. In addition to the purchase price for the Gilmour Co. stock ($3,780,550), petitioner knowingly assumed liabilities of $159,451.93. It is reasonable to conclude that the existence of these liabilities was recognized by petitioner and Gilmour Co. in the course of their negotiations and that the agreed-upon stock purchase price took these liabilities into account.

Similarly, there can be little doubt that petitioner was aware of Gilmour Co.'s potential liability under sections 1245 and 47. Robert M. Smith, petitioner's chief executive officer, was a certified public accountant with an extensive tax and accounting practice. As a CPA and tax practitioner, Smith was cognizant of the depreciation and investment credit recapture provisions of the Internal Revenue Code. He had prepared the returns for Gilmour Co. on which the accelerated depreciation was claimed. In view of these facts, we believe it is a reasonable inference that these potential liabilities were a factor in the bargaining process and had an impact upon the ultimate purchase price for the Gilmour Co. stock.

Respondent was justified, therefore, in adding both of the liabilities in question to the cost of the stock since petitioner must have regarded the acquired assets as having a value at least equal to that total amount. Logically, if we are to place a value on intangibles under the residual method, we must employ a starting figure which represents all of the consideration paid for all of the assets. *Florida Publishing Co. v. Commissioner, supra.*

We conclude that, for the purpose of applying the residual method of valuing intangibles, the known values of the tangible assets are to be subtracted from $4,052,730.93, an amount which reflects the $3,780,550 cost of the stock plus the liabilities assumed ($159,451.93 and $112,729).[6]

---

[5]See also *Moss American Inc. v. Commissioner,* T.C. Memo. 1974–252. While the *Moss American* case does not specifically deal with the residual method for valuing intangibles, it does involve the question of how the fair market values of acquired assets are to be determined in a sec. 334(b)(2) context. There the Court held that the total fair market value of all such assets was, under sec. 334(b)(2), equal to the total of (1) the amount paid by the parent for the subsidiary's stock, plus (2) the amount of the liabilities assumed by the parent.

[6]Among the assets with known values which respondent subtracts from total consideration (in applying the residual method on his memorandum brief) is a receivable for prepaid estimated Federal

## Section 6653(a) Addition to Tax

In our opinion in this case (T.C. Memo. 1977–23), we held that Gilmour Co. was liable for the addition to tax under section 6653(a) because the final corporate tax return for Gilmour Co. failed to include the income realized under section 1245 from the recapture of depreciation previously taken on certain assets.

In their initial computations filed under Rule 155, both parties treated the $5,636.45 addition to tax as an item to be added to adjusted basis under section 1.334–1(c)(4)(v)(a)(1), Income Tax Regs. Respondent now believes that this amount should not be an upward refinement to adjusted basis.

It is apparent that this liability did not accrue until Gilmour Co. negligently filed its tax return for the period ended March 31, 1970. That return was prepared by Robert M. Smith.

Section 1.334–1(c)(4)(v)(a)(1) requires adjusted basis to be increased "by the amount of any unsecured liabilities assumed by the parent." This provision of the regulations is directed at arriving at an accurate purchase price for purposes of allocation among the acquired assets. We therefore do not believe that the quoted language can be viewed as encompassing a liability like the addition to tax under discussion, which was not in existence at the time of the stock purchase and liquidation and which arose as a direct result of actions that were taken by the *parent's* chief executive officer well after the close of the subsidiary's final taxable period.

The section 6653(a) addition to tax was plainly not a liability "assumed by the parent" as a result of the stock purchase and liquidation. Under these circumstances, we hold that the $5,636.45 addition to tax should not be added to adjusted basis.

## Interim Period Earnings and Profits

In their original Rule 155 computations, petitioner and

---

taxes in the amount of $58,550. Petitioner's computation does not include this asset, but we believe it properly should be included since it was unquestionably an item of value which petitioner knowingly purchased. This receivable is valued at face amount. See the discussion ahead entitled "Cash and Its Equivalent" at p. 330.

Petitioner has included as one of the subtractions an asset identified as "globe and pylon." That item, valued by petitioner at $9,903.79, is not included by respondent in his list of assets acquired by petitioner. For the reasons given ahead in the section of this opinion entitled "Globe and Pylon," we hold that this item is not to be regarded as an asset acquired by petitioner in the liquidation.

respondent agreed that there should be an upward refinement to adjusted basis of $49,934.44 for interim earnings and profits pursuant to section 1.334–1(c)(4)(v)(a)(2), Income Tax Regs.

The starting point for the $49,934.44 figure was the Gilmour Co.'s taxable income for its taxable year ended March 31, 1970 ($493,650.07). From this amount was subtracted the tax liability of Gilmour Co. ($268,954.08). The resulting figure ($224,704.99) was then divided by 9[7] to obtain an "average monthly earnings and profits" of $24,967.22. This last amount was multiplied by 2, the number of months comprising the interim period, and the result ($49,934.44) was the interim earnings and profits refinement.

Respondent now says that this calculation was incorrect and that only a refinement of $33,961.96 is justified. He points out that his original computation of the E & P refinement included the effect of the recapture provisions of section 1245 and section 47 of the 1954 Code. Respondent contends that the amounts recaptured under these sections upon the liquidation of a subsidiary are "not items which are designed to be included in earnings and profits during the interim period."[8] Respondent argues that gains produced by sections 1245 and 47 are attributable to the period prior to the stock purchase and do not reflect an increase in the value of the subsidiary's stock during the interim period. Therefore, respondent believes no upward refinement to adjusted basis is justified.

We are unable to agree with respondent. We base our conclusion on *First National State Bank of New Jersey v. Commissioner*, 51 T.C. 419 (1968), a case which respondent acknowledges is contrary to the position he advances herein. That case also involved an acquisition and liquidation under section 334(b)(2) and an earnings and profits refinement pursuant to section 1.334–1(c)(4)(v)(a)(2), Income Tax Regs. The Commissioner had determined that, in its final income tax return, the subsidiary therein had to include in income its reserve for bad debts of $998,325.96. The taxpayer (the parent corporation) argued that, for the purpose of making the refinement to adjustment basis required by the above-cited regulation, this amount should be added to earnings and profits

---

[7]This figure was used by both parties in their calculations. We assume Gilmour Co.'s normal fiscal year ended on June 30.

[8]Memorandum Brief for Respondent, filed Aug. 9, 1977, at p. 26.

(less the income tax liabilities which resulted to the subsidiary from the addition of this amount to its income). The Court agreed, stating at pages 427–428:

There was an increase in earnings and profits of [the subsidiary] for its [final taxable] period ending October 10, 1958, because of the additional income it received by adding its bad debt reserve to income. October 10, 1958, was the "date of the last distribution in liquidation" attributable to [the subsidiary's] stock held by [the parent] since the complete liquidation was accomplished on that date. October 10, 1958, was also "the date of purchase" of [the subsidiary's] stock by [the parent]. * * *

it is clear that it was the distribution in liquidation that required the addition to income of the reserve for bad debts since it was upon the liquidation that the bad debt reserve was no longer needed by [the subsidiary]. See *Geyer, Cornell & Newell, Inc.*, 6 T.C. 96 (1946). Therefore, it was an event happening on October 10, 1958, immediately subsequent to [the parent's] acquisition of [the subsidiary's] stock that caused the necessity of adding the $998,325.96 bad debt reserve to * * * income for [the] period January 1 through October 10, 1958. * * * The cause of the increase in income, and therefore the increase in earnings and profits, of [the subsidiary] was the distribution of all of [the subsidiary's] assets in liquidation under an arrangement to which section 334(b)(2) was applicable. This is the situation which respondent's regulations cover. We, therefore, conclude that [the taxpayer/parent] was correct in adding the earnings and profits resulting to [the subsidiary] from the inclusion of the bad debt reserve in its income to the adjusted basis of [the subsidiary's] stock in accordance with respondent's regulations for the purpose of determining its total basis in the assets which it acquired from [the subsidiary] in accordance with the provisions of section 334(b)(2).

In the instant case, as well, the increase in the subsidiary's income (here occasioned by the recapture provisions of sections 1245 and 47) and the resultant increase in earnings and profits was caused by the distribution in liquidation. Thus, as in *First National State Bank of New Jersey*, it was *an event occurring subsequent to the last day of the subsidiary's final taxable period* which necessitated the application of the provisions of sections 1245 and 47 during that taxable period.

Therefore, we conclude that in the present case the recaptured amounts are not to be excluded from the refinement required by section 1.334–1(c)(4)(v)(*a*)(*2*), Income Tax Regs.

Respondent argues alternatively, in the event the Court should hold the *First National State Bank of New Jersey* case to be applicable herein, that it is necessary to apply the "substituted basis" rules of section 1.334–1(c)(4)(vi)(*a*) and section 1.334–1(c)(4)(vi)(*b*), Income Tax Regs., with reference to those assets to

which section 1245 applies. Under this alternative argument, respondent calculates an even smaller earnings and profits refinement ($20,355.62).[9]

Section 1.334–1(c)(4)(vi), Income Tax Regs., provides (in pertinent part):

(vi) For the purpose of subdivision (v)(*a*)(*2*) and (*b*)(*2*) of this subparagraph:

(*a*) With respect to property held on the date of purchase and property held on the date additional stock, if any, is acquired any gain or loss from sales or exchanges of such property (whether tangible or intangible) and any other items determined by reference to basis of such property shall be computed by substituting for such basis a new basis determined by reference to the part of the adjusted basis of the stock allocable to such property.

(*b*) The part of the adjusted basis of stock allocable to such property for the purpose of (*a*) of this subdivision shall be the basis of the stock held on the date of purchase or on the date of a later acquisition of stock allocated among the assets held on such date on the basis of their net fair market values on such date,

Respondent asserts that the phrase "any other items determined by reference to basis of such property" encompasses assets to which section 1245 applies.[10]

Respondent apparently believes that the section 1245 recapture is to be ignored completely. He appears to compute the earnings and profits adjustment as though, at the time of the stock purchase, each of the assets had a basis equal to its fair market value. See n. 9 *supra.* By making this assumption, respondent eliminates any requirement to recapture and, correspondingly, eliminates any additional tax liability based on recapture.

We believe respondent's adjustment is not within the intendment of the regulations because it disregards the realities of what actually occurred during the interim period. We have just discussed the necessity of taking the recapture provisions of section 1245 into account in making the earnings and profits

---

[9]Respondent arrives at the smaller earnings and profits refinement by subtracting from Gilmour Co.'s taxable income ($493,650.07) the amount of the sec. 1245 recapture ($189,950.16) to arrive at a figure of $303,699.91. He then subtracts the tax on this last amount (ignoring sec. 47) and multiplies the remainder by two-ninths. From the resulting figure ($33,951.96) respondent subtracts the *entire* sec. 47 tax ($13,596.34) since it "would seemingly accrue solely in the two month interim period." The result is a $20,355.62 upward refinement for interim earnings and profits.

[10]Some commentators have conjectured regarding the potential interrelationship of sec. 334(b)(2) and sec. 1245 in this context and have pointed out the complexities that such an interrelationship would create. See, e.g., J. Solari, "Solving Asset Basis Problems Created by 334(b)(2) Liquidations," 29 J. Taxation 150, 151–153 (1968), and J. Sheppard, "Depreciation Recapture: Some Practical Problems in Working with Section 1245," 24 J. Taxation 194, 196–197 (1966).

adjustment herein, cf. *First National State Bank of New Jersey v. Commissioner, supra,* and respondent's interpretation seems in essence to be directed at circumventing that requirement. We are unable to regard as reasonable a construction of the regulations which suggests that the recapturing of income, a significant event during the interim period, is to be ignored.

We believe respondent has lost sight of the purpose of the regulations on which he relies.

In general, sec. 1.334–1(c)(4), Income Tax Regs., which deals with problems arising when the acquisition of stock and the liquidation do not occur at the same time, is designed "to put the parent in essentially the same position, for basis purposes, as if the subsidiary had been liquidated immediately after the parent purchased its stock." B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, p. 11–40 (3d ed. 1971). See also *Knapp King-Size Corp. v. United States,* 527 F.2d 1392, 1396 (Ct. Cl. 1975).

To accomplish this purpose, sec. 1.334–1(c)(4)(v), Income Tax Regs., provides that the parent's basis in the subsidiary's stock is to be increased by post-acquisition earnings and profits.[11] In this regard, sec. 1.334–1(c) (4)(vi), Income Tax Regs., utilizes "a hypothetical basis for the subsidiary's assets, determined as if the parent had promptly liquidated [the subsidiary] at the time of the qualifying stock purchase." B. Bittker & J. Eustice, *supra* at 11–41.

It should be apparent that the recapture provisions of section 1245 would have been applied no differently in this case had the subsidiary been liquidated immediately upon the acquisition of its stock by petitioner. Since the section 1245 recapture in this case is not affected by the delay in liquidation, there is no logical justification for claiming that the application of that section should bring into play the basis rules of section 1.334–1(c)(4)(vi), Income Tax Regs. That provision of the regulations is intended to equalize events which occur during the interim period by

---

[11]See generally the Solari and Sheppard articles cited above in n. 10. In the Sheppard article the following statement appears:

"The net effect of the interim E&P rule is to give Parent the same basis for the assets distributed as it would have had from a prompt liquidation. The intention was to remove any basis advantages or disadvantages from delay. [24 J. Taxation at 196.]"

Cf. *Pacific Transport Co. v. Commissioner,* T.C. Memo. 1970–41, remanded on another issue 483 F.2d 209 (9th Cir. 1973), cert. denied 415 U.S. 948 (1974).

having all calculations made with reference to the same point in time—the date of the stock acquisition.

Since the section 1245 recapture in this case was not subject to variation during the interim period, it does not fall within the purview of section 1.334–1(c)(4)(vi).[12]

Accordingly, we conclude that the upward refinement to E & P of $49,934.44, urged by both parties in their initial computations under Rule 155, is to be applied in this case. Aside from the contentions discussed and rejected above, neither party disputes the accuracy of the method by which that figure was calculated.

### Cash and Its Equivalent

(A) *Receivable for Estimated Federal Taxes:*—Section 1.334–1(c)(4)(v)(*b*)(*1*), Income Tax Regs., provides that the adjusted basis of the subsidiary's stock held by the parent shall be decreased by the amount of any "cash and its equivalent" received by the parent. Respondent, in his original Rule 155 computation, determined that petitioner had received $126,114.52 of cash and $58,550 of cash "equivalent" in the form of a receivable for prepaid estimated Federal taxes. Respondent therefore made downward refinements to adjusted basis in those amounts. Petitioner's Rule 155 computation made the same downward refinements to adjusted basis, although petitioner chose to subtract out the $58,550 receivable for estimated Federal taxes by reducing an upward refinement (liabilities assumed) to basis by that amount.

In his memorandum brief, filed August 9, 1977, respondent states that he erred in treating the $58,550 receivable as a cash equivalent. Respondent now believes this item does not satisfy the definition of cash "equivalent" set forth in Rev. Rul. 66–290, 1966–2 C.B. 112. Thus, respondent has eliminated the $58,550 downward refinement to adjusted basis made in his original Rule 155 computation.[13]

In addition to appearing in section 1.334–1(c)(4)(v)(*b*)(*1*), the

---

[12]Similarly, since the provisions of sec. 47 would be applied in the same manner regardless of when the liquidation occurred, that section, too, is not within the scope of sec. 1.334–1(c)(4)(vi), Income Tax Regs. We do not agree with respondent that the entire sec. 47 tax should be applied to the interim period. (see n. 9 *supra.* ) A corporation's tax liability for a given taxable year has an effect on earnings and profits during the entire taxable period and should be apportioned accordingly.

[13]The elimination of a downward refinement to adjusted basis is to the benefit of petitioner because it has the effect of increasing the amounts to be allocated as the bases of its depreciable assets. Nevertheless, because of the complex nature of the regulatory scheme (see, e.g., sec. 1.334–

term "cash and its equivalent" is also found in section 1.334–1(c)(4)(viii), Income Tax Regs., which deals with the allocation of refined adjusted basis. However, nowhere in the regulations is the term defined.

Some clarification is found in authorities which have employed the "cash and its equivalent" terminology either in a section 334(b)(2) context[14] or in other situations involving the allocation of a lump-sum purchase price among specific assets.[15] See generally 3A J. Mertens, Law of Federal Income Taxation, sec. 21.32, pp. 99–100(1968 rev.), and the 1977 Annual Cumulative Supplement to Volume 3A, sec. 21.32, pp. 13–14.

An analysis of these authorities indicates that, in order for an item to qualify as a cash "equivalent," it must be in the nature of money; that is, it must be convertible into cash at face amount as a matter of certainty. Where any restrictions or conditions exist on the enjoyment by the taxpayer of the benefits of the full amount, then to the extent of those restrictions or conditions the item does not qualify.

Revenue Ruling 66–290, cited by respondent, is not directly on point.[16] That ruling precludes from the "cash and its equivalent" category such items as "accounts receivable (as the term is commonly used), inventories, marketable securities, and other similar current assets." It does not discuss a receivable for prepaid Federal taxes. We would not disagree with the correctness of the ruling as applied to the accounts receivable in the instant case. Since we have no evidence as to the certainty of the collection of these accounts in their face amounts, we would be unable to conclude that they are the "equivalent of money in the bank." *F. & D. Rentals, Inc. v. Commissioner*, 44 T.C. 335,

---

1(c)(4)(viii), Income Tax Regs., which also contains the "cash and its equivalent" concept), we cannot be bound by this concession.

[14]See, e.g., *Boise Cascade Corp. v. United States*, 288 F. Supp. 770 (D. Idaho 1968); Rev. Rul. 66–290, 1966–2 C.B. 112.

[15]See, e.g., *Victor Meat Co. v. Commissioner*, 52 T.C. 929 (1969); *F. & D. Rentals, Inc. v. Commissioner*, 44 T.C. 335 (1965), affd. 365 F.2d 34 (7th Cir. 1966), cert. denied 385 U.S. 1004 (1967). See also *Davis v. Commissioner*, T.C. Memo. 1965–30, and *Graves v. Commissioner*, a Memorandum Opinion of this Court dated May 14, 1952.

[16]Rev. Rul. 66–290, 1966–2 C.B. 112, provides:

"The phrase 'cash and its equivalent' used in sections 1.334–1(c)(4)(v)(b)(1) and 1.334–1(c)(4)(viii) of the regulations includes cash, currency, bank deposits (including time deposits) whether or not interest bearing, share accounts in savings and loan associations, checks (whether or not certified), drafts, money orders, and any other item of similar nature. It does not include accounts receivable (as the term is commonly used), inventories, marketable securities, and other similar current assets."

347 (1965), affd. 365 F.2d 34 (7th Cir. 1966), cert. denied 385 U.S. 1004 (1967). See *Victor Meat Co. v. Commissioner*, 52 T.C. 929, 932 (1969); *Boise Cascade Corp. v. United States*, 288 F. Supp. 770, 772–773 (D. Idaho 1968).

However, we are unable to reach the same conclusion as to the receivable for prepaid estimated Federal taxes. Unlike the situation with regard to the accounts receivable, there can be little doubt here that not a dollar less than $58,550 will be applied to petitioner's benefit. No conditions or restrictions stand in the way of the full amount being so applied. The receivable is therefore like money in a bank account, with its full face value convertible into cash as a certainty for the payment of taxes. As such, it would be illogical for us to include this receivable in these computations among the noncash assets which petitioner acquired in the liquidation.[17]

We hold that the receivable for estimated Federal taxes is an "equivalent" of cash for the purposes of section 1.334–1(c)(4)(*b*)(*1*), Income Tax Regs.

(B) *Additional Cash Received:*—In their Rule 155 computations, both respondent and petitioner listed the following items as assets acquired by petitioner upon the liquidation of Gilmour Co.:

Real estate sold to [R.A.] Gilmour ............ $192,836.10
Machinery and equipment
sold to [R.A.] Gilmour .............................. 87,713.90

In his memorandum brief, filed August 9, 1977, respondent argues for the first time that petitioner did not acquire these assets; respondent now claims they were sold by Gilmour Co. to R.A. Gilmour on January 31, 1970, for the total amount of $280,550. As a result, respondent concludes that the $280,550 constitutes additional cash received by petitioner under section 1.334–1(c)(4)(v)(*b*)(*1*), necessitating a downward refinement to adjusted basis in that amount.

Some confusion exists in the record because the parties have made inconsistent stipulations. On the one hand, the parties have

---

[17]It would be equally as illogical, for purposes of sec. 1.334–1(c)(4)(viii), Income Tax Regs. (which also employs the "cash and its equivalent" terminology), to allot a basis to this receivable which would be in an amount other than $58,550. See the discussion ahead entitled "Allocation of Refined Adjusted Basis."

stipulated that the assets in question were sold by Gilmour Co. prior to the liquidation,[18] and on the other hand, the parties have stipulated that these assets were received by petitioner "upon the liquidation."[19]

We believe the Findings of Fact portion of our original opinion in this case clearly sets forth the timing of the various elements of the sale and liquidation and thereby resolves this conflict:

The sale [of the Gilmour Co. stock to petitioner] was finally consummated on March 24, 1970, at which time all the stock of Gilmour Co. was transferred to petitioner. Contemporaneously therewith, Smith caused Gilmour Co. to sell its real estate to R.A. Gilmour for $192,836.10, and the airplane hangar and miscellaneous machinery and equipment for [$87,713.90]. R.A. Gilmour then leased the real estate to petitioner for a term of 10 years effective February 1, 1970, at an annual rental of $36,000. * * *

Between Smith and R.A. Gilmour, the sale and purchase of stock was treated by the parties as if it were consummated on January 31, 1970, as initially contemplated in the memorandum agreement for the sale of assets. * * *

Immediately upon closing of the stock purchase transaction on or about March 24, 1970, petitioner began the liquidation of Gilmour Co., which was completed by March 31, 1970. * * *

---

[18]"5. As a part of the closing of the sale of the stock of Gilmour Manufacturing Company to your petitioner, your petitioner caused Gilmour Manufacturing Company to deed the real estate owned by Gilmour Manufacturing Company to R.A. Gilmour in consideration of the payment by R.A. Gilmour of the book value of the building and landscaping aggregating $192,836.10 and leased back by R.A. Gilmour to your petitioner under the terms and conditions of a lease executed by the parties * * * . The sale price of the building and landscaping in the amount of $192,836.10 was also the fair market value of the building and landscaping of the date of the sale to R.A. Gilmour. [Stipulation of Facts, filed Dec. 4, 1975, at p. 3.]

"6. As a part of the said closing, your petitioner also caused Gilmour Manufacturing Company to sell certain machinery and equipment consisting of an airplane, airplane hanger [sic], bulldozer, etc. and not needed by your petitioner in its business to R.A. Gilmour as follows:

| Item | Book value and sales price |
| --- | --- |
| Machinery and equipment | $71,758.57 |
| Airplane hanger [sic] | 15,955.33 |

The sales price[s] of the machinery and equipment and the airplane hanger [sic] in the amounts of $71,758.57 and $15,955.33, respectively, were also the fair market values of said assets, respectively, on the date of the sale to R.A. Gilmour. [Stipulation of Facts, filed Dec. 4, 1975, at pp. 3-4.]"

[19]"10. The parties agree on March 31, 1970 that the fair market value of certain assets received by the petitioner upon the liquidation of Gilmour Mfg. Co. is, as follows:

| Assets | Value |
| --- | --- |
| * * * | * * * |
| Real estate described in par. 5 above | $192,836.10 |
| Machinery and equipment and airplane hanger [sic] described in par. 6 above | 87,713.90 |

[Stipulation of Facts No. 2, filed Dec. 5, 1975, at p. 2.]"

It is apparent from our opinion that the sale to R.A. Gilmour took place after petitioner acquired the stock and before petitioner liquidated Gilmour Co. and acquired its assets. We conclude that petitioner did not acquire the assets at issue upon the liquidation and assume it received the cash instead ($192,836.10 plus $87,713.90).

We therefore agree with respondent that the $280,550 constitutes additional cash received by peitioner under section 1.334–1(c)(4)(v)(*b*)(*1*), Income Tax Regs., necessitating a downward refinement to adjusted basis in that amount.

One further point should be mentioned. Because the sales of these items took place during the period following the stock purchase and prior to the liquidation (i.e., during the interim period), it is necessary to determine whether an adjustment is required to earnings and profits for any gain or loss realized on the sales. See in this regard section 1.334–1(c)(4)(vi) and section 1.334–1(c)(5), Income Tax Regs. Neither party discusses this point. On the facts before us, we hold that no such adjustment is required.[20]

## *Downward Refinement for Liabilities*

In its computation submitted under Rule 155, petitioner included among the downward refinements to adjusted basis required by section 1.334–1(e)(4)(v)(*b*), Income Tax Regs., the following three items:

| | | |
|---|---|---|
| Liabilities assumed | [21] | $100,901.93 |
| Recapture taxes | [22] | 112,729.00 |
| Penalty | [23] | 5,636.45 |

Having also added these items to adjusted basis pursuant to

[20]For the purpose of applying sec. 1.334–1(c)(4)(vi), Income Tax Regs., we conclude that the "adjusted basis of the stock" (i.e., "the basis of the stock held on the date of purchase") is to be calculated in the same manner that we computed the cost of the stock in the section of this opinion entitled "Calculation of the Value of Intangibles" at p. 322. The fair market values of all tangible assets have been stipulated by the parties (or determined by the Court), and the fair market value of the intangibles is to be calculated pursuant to the discussion in the above-mentioned section of this opinion. On the facts of this case, "the part of the adjusted basis of the stock allocable to such property" is equal to the fair market value of the property. Since the selling price for the property is also equal to the fair market value, there is no gain or loss to be included as part of the earnings and profits adjustment.

[21]Petitioner arrives at this figure by subtracting from liabilities assumed ($159,451.93) the amount of the receivable for estimated Federal taxes ($58,550).

[22]Petitioner has reference here to taxes arising pursuant to secs. 1245 and 47.

[23]Petitioner has reference here to the addition to tax under sec. 6653(a).

section 1.334–1(c)(4)(v)(*a*)(*1*), Income Tax Regs., petitioner is in effect eliminating these three amounts from the computation of refined adjusted basis.

Labeling the three items "Residuary Value Goodwill," petitioner states that these reductions to adjusted basis, although not to petitioner's advantage, are required by our opinion in this case.[24] Respondent does not agree.

To the extent that we can follow petitioner's reasoning, it appears petitioner is of the view that the Court regards these items as part of goodwill. Since we held in our opinion that goodwill is not to be allocated among the tangible assets received from Gilmour Co., and since the inclusion of these amounts in refined adjusted basis would result in just such an allocation, petitioner believes it must offset its upward refinement (required by sec. 1.334–1(c)(4)(v)(*a*)(*1*)) with a downward refinement.

The flaw in petitioner's thinking is its unwarranted conclusion that the Court treated these amounts as part of goodwill. We did not. We believe the liabilities assumed by petitioner ($159,451.93) and the taxes under sections 1245 and 47 ($112,729) have the effect of increasing petitioner's cost for the stock.[25] They are plainly liabilities which should be added to adjusted basis and then spread among the assets acquired. This is the scheme of the regulations, and we think it is sound. Nothing in the Court's action in denying petitioner's motion for reconsideration and nothing in the pertinent regulatory provisions requires the suggested reductions to adjusted basis. We find no decisional authority or logical justification for it.

We hold that the three items above described should not be subtracted from adjusted basis.

### Allocation of Refined Adjusted Basis

Under section 1.334–1(c)(4), Income Tax Regs., petitioner's refined adjusted basis in the Gilmour Co. stock becomes the total basis for all assets petitioner acquired from Gilmour Co., both tangible and intangible. Allocation of this total figure among

---

[24]Petitioner also makes particular reference to the Court's action in denying its Motion for Reconsideration of Findings and Opinion, filed Feb. 24, 1977.

[25]See the discussion of these two amounts in the section of this opinion entitled "Calculation of the Value of Intangibles." As to the $5,636.45 addition to tax under sec. 6653(a), we have concluded that this is an item which is not properly added to adjusted bases. See p. 323 of this opinion.

the specific assets is accomplished in the manner set forth in section 1.334–1(c)(4)(viii), Income Tax Regs.

An analysis of the language of section 1.334–1(c)(4)(viii) indicates that refined adjusted basis is not to be allocated among items which are "cash and its equivalent." Such items have already been subtracted (at face value) in the course of making the refinements required by section 1.334–1(c)(4)(v)(*b*)(*1*), Income Tax Regs. (See the section of this opinion entitled "Cash and Its Equivalent.") Accordingly, the refined adjusted basis figure does not include a cash element.

Pursuant to section 1.334–1(c)(4)(viii), refined adjusted basis is allocated by spreading that amount among the acquired (non-"cash and its equivalent") assets in proportion to their respective fair market values. Respondent points out that the regulation employs the word "ordinarily" in this context, and respondent argues that accounts receivable ($554,767) is an exception to the "ordinary" situation and should not be allocated a basis in excess of its face amount.[26] Respondent believes this item should be subtracted from refined adjusted basis before the allocation is made. Although respondent does not consider this receivable to be "cash and its equivalent,"[27] he feels it would be equally anomalous for it to be subjected to allocation in the "ordinary" manner and thus be assigned a basis which exceeds its face value. (In the instant case, under the general rule set forth in section 1.334–1(c)(4)(viii), Income Tax Regs., accounts receivable would receive a basis in excess of its face amount.)

It is true, as petitioner points out, that both *Boise Cascade Corp. v. United States*, 288 F.Supp. 770 (D. Idaho 1968), and Rev. Rul. 66–290, 1966–2 C.B. 112, adopt the position that this receivable is not to be subtracted under section 1.334–1(c)(4)(v)(*b*)(*2*), Income Tax Regs., in computing refined adjusted basis. But here respondent is arguing that accounts receivable should be subtracted *after* the refined adjusted basis figure is

---

[26]Because respondent does not regard the receivable for estimated Federal taxes as a cash "equivalent," he makes the same argument with reference to that item. In the section of this opinion entitled "Cash and Its Equivalent," we treated this tax receivable as a cash "equivalent." As such, it cannot be allocated a basis in excess of its face amount ($58,550). The term "cash and its equivalent" must have the same meaning in sec. 1.334–1(c)(4)(viii), Income Tax Regs., that it has in sec. 1.334–1(c)(4)(v)(*b*)(*1*), Income Tax Regs. *Boise Cascade Corp. v. United States*, 288 F.Supp. 770, 772 (D. Idaho 1968).

[27]We agree with respondent that, on the record before us, accounts receivable cannot be regarded as a cash "equivalent." See the discussion above entitled "Cash and Its Equivalent" at p. 329.

determined. The above-cited authorities do not consider this question or the implications of the word "ordinarily" in section 1.334–1(c)(4)(viii), Income Tax Regs.

There is little doubt in a situation like the present one that respondent has authority to make an "equitable apportionment," (sec. 1.61–6, Income Tax Regs.) "in accordance with the realities of the transaction." *F. & D. Rentals, Inc. v. Commissioner*, 44 T.C. 335, 345 (1965). Further, in a case like the instant one where application of the general rule will result in the allocation of a basis to accounts receivable in excess of its face amount, there can be little doubt that the approach urged by respondent comports more with the realities of the situation. Realistically, collection of these accounts could be in an amount *less* than total face amount, but it is highly doubtful that collection could be in *excess* of face amount.

After due consideration, we believe an application of section 1.334–1(c)(4)(viii), Income Tax Regs., which presumes a price higher than face was paid for accounts receivable (by assigning a basis greater than face amount) would be an artificial and overly technical extension of what is only a general interpretive rule. Accordingly, we conclude that, in applying section 1.334–1(c)(4)(viii), Income Tax Regs., the basis ascribed to accounts receivable should be no greater than the total face amount of that asset. On the facts of this case, our conclusion requires that such face amount be subtracted from the refined adjusted basis figure before apportionment is made.

Consistent with the foregoing discussion, the basis of each of the remaining assets is to be determined in accordance with the formula set forth on Schedule Five, *infra,* in the conclusion portion of this opinion. Cf. *F. & D. Rentals, Inc. v. Commissioner, supra* at 346.

### *Globe and Pylon*

In the findings of fact portion of our original opinion in this case, based on the stipulation of the parties, we listed the tangible assets of value which petitioner received upon the liquidation of Gilmour Co.

In its Rule 155 computation, petitioner listed an additional asset not included in the stipulation of the parties, an item identified by petitioner as "globe and pylon." The globe and pylon had been subjected by respondent in the statutory notice

to the recapture provisions of section 1245. Petitioner conceded the correctness of this adjustment. Now petitioner claims that the $9,903.79 amount recaptured reflects the fair market value of the globe and pylon at the time of the stock purchase and liquidation. Petitioner contends that this amount was the price at which the globe and pylon, separate and apart from the land on which it was situated, was transferred to petitioner by Gilmour Co. Because respondent applied the section 1245 recapture provisions to this item, petitioner believes respondent is estopped from excluding it as an asset with a value of $9,903.79.[28]

Although petitioner has had ample opportunity prior to these proceedings under Rule 155 to advance the contention that the globe and pylon, as an asset distinct from the land on which it was situated, was a depreciable item received by petitioner in the liquidation at a fair market value of $9,903.79, petitioner has not done so. In fact, petitioner has previously given the Court reason to believe that petitioner had agreed, for purposes of this case, the globe and pylon was to have no value.[29]

While we would ordinarily be inclined to give a petitioner the benefit of the doubt and permit it to include in its computations an asset inadvertently omitted, we are unable to do so when, as here, the factual and legal bases for such inclusion are not readily apparent. Obviously the burden of proof as to any new assertions is on petitioner, and any omissions in this regard must of necessity inure to petitioner's detriment. Rule 142(a), Tax Court Rules of Practice and Procedure; *Welch v. Helvering*, 290 U.S. 111 (1933). In a proceeding under Rule 155, we are unable to begin an inquiry as to novel factual or legal contentions advanced by either party. Rule 155(c), Tax Court Rules of Practice and Procedure; *Bankers Pocahontas Coal Co. v. Burnet*, 287 U.S. 308 (1932); *Estate of Stein v. Commissioner*, 40 T.C. 275, 278–280 (1963). See generally 9 J. Mertens, Law of Federal Income Taxation, sec. 50.106 (1977 rev.).

In the section of this opinion entitled "Cash and Its Equiva-

---

[28]Petitioner appears to be arguing that, under the provisions of sec. 1245(a)(1)(B), the $9,903.79 amount at issue reflects either the "recomputed basis" of the globe and pylon or its fair market value, whichever amount is lower. As a result, when respondent determined in his statutory notice that $9,903.79 was to be recaptured under sec. 1245, petitioner believes respondent conceded that the globe and pylon had a fair market value of at least that amount. Had petitioner received the globe and pylon, this argument would not be without merit.

[29]See Brief for Petitioner, filed Mar. 22, 1976, at p. 9.

lent," at page 330, we discuss the real estate transferred to R.A. Gilmour at a purchase price of $192,836.10. The globe and pylon was included in that transfer.[30]

We point out in our earlier discussion that the sale to R.A. Gilmour took place before petitioner liquidated Gilmour Co. and acquired its assets and that petitioner therefore did not acquire the real estate upon liquidation but received $192,836.10 in cash instead.

Accordingly, on the record before us, we must conclude that petitioner never acquired the globe and pylon. While it is clear from our earlier discussion that the real estate (including the globe and pylon) was leased back to petitioner under a 10-year lease, petitioner has not attempted to establish that the leasehold interest was an asset in which petitioner held a depreciable interest, and the record would not support such a claim.

We hold that petitioner's computation was in error when it included the globe and pylon in the list of acquired assets at a fair market value of $9,903.79.

### Losses Claimed by Petitioner

The allocation of refined adjusted basis to the assets acquired by petitioner will, in this case, result in most of the assets being assigned a "new" basis which exceeds the "old" basis they had in the hands of Gilmour Co.

In its Rule 155 computation, petitioner listed four items— inventory, accounts receivable, real estate sold to R.A. Gilmour, and machinery and equipment sold to R.A. Gilmour—and claimed that the difference between the "new" basis (as allocated pursuant to sec. 1.334–1(c)(4), Income Tax Regs.), and the "old" basis (as reported on Gilmour Co.'s final income tax return) in each of these assets was a "loss" deductible by petitioner in the taxable year in which the acquisition occurred (petitioner's taxable year ended August 31, 1970).

(A) *Inventory.*—As to the claimed inventory "loss," petitioner points out that an accrual basis taxpayer computes cost of goods sold by subtracting its closing inventory from the sum of (1)

---

[30]Petitioner has conceded this point. See Brief for Petitioner, filed Mar. 22, 1976, at p. 9; Petitioner's Computation of Tax Pursuant to Decision, filed Apr. 26, 1977, at p. 1, n. 1; see also transcript of hearing of May 4, 1977, at pp. 4–5.

opening inventory, plus (2) inventory purchases during the year. If there is an increase in the basis of opening inventory, then, to the extent of the difference, there is a resulting increase in cost of goods sold. According to petitioner, this increase should be deductible.

In his memorandum brief, filed August 9, 1977, respondent agreed "that petitioner is entitled, for its taxable year ended August 31, 1970, to an additional increase in its beginning inventory which would result in a concomitant increase in its cost of goods sold and a similar decrease in its gross profits."[31]

(B) *Accounts Receivable.*—Because of our conclusion herein that the "new" basis in this asset is to be limited to its face amount, there is no increase over the "old" basis ($554,767) and no "loss."

(C) *Real Estate, Machinery, and Equipment Sold to R.A. Gilmour.*—As earlier described, the sale of these items to R.A. Gilmour took place before petitioner liquidated Gilmour Co. and acquired its assets. As a result, in lieu of these items, petitioner received an additional $280,550 in cash upon the liquidation. This amount is subtracted before refined adjusted basis is allocated. It is clear, therefore, that petitioner has no "new" basis with which to compute a "loss."

## Conclusion

To avoid further argument and delay in the disposition of this case, we are including below our determination of petitioner's refined adjusted basis in the Gilmour Co. stock and our calculation of the fair market value of the intangibles received in the liquidation. Further, we provide a formula for allocating refined adjusted basis to certain assets acquired by petitioner, and we show the amounts which are to be used in applying that formula. The amounts so allocated to the various assets will be petitioner's basis in those assets for purposes of computing depreciation and amortization. We expect the parties to file with the Court an agreed computation of allowable depreciation and amortization and also a stipulated decision based upon that computation and the findings and conclusions of the Court found herein and in our first opinion in this case.

---

[31]Memorandum Brief for Respondent at p. 41.

SCHEDULES

The following seven schedules contain our calculations. The fair market value of the intangibles (Schedule Three) is obtained by subtracting the total fair market value of all tangible assets received in liquidation (Schedule Two) from the total consideration paid for the Gilmour Co. stock (Schedule One). We also provide our calculation of refined adjusted basis (Schedule Four) and show the formula (Schedule Five) for allocating that amount (as reduced in Schedule Six) among certain assets (Schedule Seven).

## Schedule One: Residual Method: Total Consideration Paid by Petitioner for Gilmour Co. Stock

| | |
|---|---:|
| Purchase price of stock | $3,780,550.00 |
| Plus liabilities assumed under secs. 1245 and 47 | 112,729.00 |
| Plus other liabilities assumed | 159,451.93 |
| Total consideration paid | 4,052,730.93 |

## Schedule Two: Residual Method: Total Fair Market Value of All Tangible Assets Received by Petitioner in the Liquidation

| | | |
|---|---|---:|
| Automobile equipment | | $14,010.00 |
| Dies | | 15,322.00 |
| Furniture and fixtures | | 12,552.00 |
| Machinery and equipment | | 542,865.00 |
| Printing plates | | 2,065.00 |
| Inventory | | 360,238.00 |
| Accounts receivables | | 554,767.00 |
| Receivable for estimated Federal taxes | | 58,550.00 |
| Patents Nos.: | | |
| D194014 | Pistol grip nozzle | 355,000.00 |
| 3,045,927 | Jet speed nozzle | 11,000.00 |
| RE 26,013 et al. | Thum Trol nozzle | 25,000.00 |
| 319,186 et al. | Sprayer | 220,000.00 |
| 3,207,443 | Dual barrel spray head | 9,000.00 |
| 3,498,543 | Wave sprinkler | 125,000.00 |
| Invention | Nozzle package | 115,000.00 |
| Cash (agreed amount) | | 126,114.52 |
| Cash (from real estate sold to R.A. Gilmour) | | 192,836.10 |
| Cash (from machinery, equipment sold to R.A. Gilmour) | | 87,713.90 |
| Total fair market value of tangible assets | | 2,827,033.52 |

## Schedule Three: Residual Method: Fair Market Value of Intangibles Received by Petitioner in the Liquidation

Total consideration paid (from schedule one) ............................. $4,052,730.93
Less total fair market value of tangible
assets (from schedule two) ................................................. 2,827,033.52
Fair market value of intangibles ....................................... $1,225,697.41

## Schedule Four: Calculation of Refined Adjusted Basis

Pursuant to section 1.334–1(c)(4)(v)(*b*), Income Tax Regs., the following refinements are to be made to petitioner's purchase price for the Gilmour Co. stock to arrive at petitioner's refined adjusted basis in the stock:

Purchase of stock ........................................................... $3,780,550.00
ADD:
*Liabilities*
  Liabilities assumed under
    secs. 1245 and 47 ................................. $112,729.00
  Other liabilities assumed ........................... 159,451.93
*Earnings and profits*
  Interim E and P adjustment ....................... 49,934.44
    Total additions ............................................................ 322,115.37
SUBTRACT:
*Cash and its equivalent*
  Cash (agreed amount) ............................. 126,114.52
  Cash (real estate sold) ............................. 192,836.10
  Cash (machinery, equipment sold) ................. 87,713.90
  Receivable for estimated
    Federal taxes ....................................... 58,550.00
    Total subtractions ........................................................ –465,214.52
Refined adjusted basis of stock ............................................. 3,637,450.85

## Schedule Five: Formula for Allocation

Pursuant to section 1.334–1(c)(4)(viii), Income Tax Regs., and the discussion in the section of this opinion entitled "Allocation of Refined Adjusted Basis," the bases of certain assets (see the table on Schedule Seven) are determined in accordance with this formula:

$$X = \frac{A}{B} \times C$$

In the formula, "X" is the basis to be allocated to a given asset

(the "unknown"), and "A" is the known fair market value of that asset (as listed on Schedule Seven). "B" is the total fair market value of all assets listed in the table on Schedule Seven, and "C" is the refined adjusted basis figure after a subtraction, as shown on Schedule Six.

### Schedule Six: Calculation of Refined Adjusted Basis Figure To Be Used in Applying Formula

Pursuant to section 1.334–1(c)(4)(viii), Income Tax Regs., and the discussion in the section of this opinion entitled "Allocation of Refined Adjusted Basis," the following subtraction is to be made from refined adjusted basis (as calculated on Schedule Four) before such basis is allocated among the acquired assets:

Refined adjusted basis .................... $3,637,450.85
Less accounts receivable ....................554,767.00
Amount to be allocated ....................3,082,683.85

### Schedule Seven: List of Acquired Assets (At Fair Market Value) to Which Formula in Schedule Five Applies

The following table includes all tangible and intangible assets acquired by petitioner in the liquidation (see Schedule Two and Schedule Three), with the exception of (1) items falling in the "cash and its equivalent" category (which are not included in the refined adjusted basis amount; see Schedule Four), and (2) accounts receivable (which is subtracted from refined adjusted basis at face amount, see Schedule Six, and thus, under section 1.334–1(c)(4)(viii), Income Tax Regs., acquires a basis equal to its face amount):

ALLOCABLE ASSETS

| Asset | Fair market value |
|---|---|
| Automobile equipment | $14,010.00 |
| Dies | 15,322.00 |
| Furniture and fixtures | 12,552.00 |
| Machinery and equipment | 542,865.00 |
| Printing plates | 2,065.00 |
| Inventory | 360,238.00 |

| Asset | | Fair market value |
|---|---|---|
| Patents Nos.: | | |
| D194014 | Pistol grip nozzle | 355,000.00 |
| 3,045,927 | Jet speed nozzle | 11,000.00 |
| RE 26,013 et al. | Thum Trol nozzle | 25,000.00 |
| 319,186 et al. | Sprayer | 220,000.00 |
| 3,207,443 | Dual barrel spray head | 9,000.00 |
| 3,498,543 | Wave sprinkler | 125,000.00 |
| Invention | Nozzle package | 115,000.00 |
| Intangibles | | 1,225,697.41 |
| Total fair market value of allocable assets | | 3,032,749.41 |

Consistent with the foregoing discussion

*An appropriate order will be entered.*